1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3

4                                      )
    UNITED STATES OF AMERICA,          )
5                                      )
            Plaintiff,                 )
6                                      )   Criminal Action
    v.                                 )   No. 1:17-CR-10305-ADB
7                                      )
    JOSEPH BAPTISTE, et al.            )
8                                      )
            Defendants.                )
9                                      )

10

11          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT JUDGE
12

13                      EVIDENTIARY HEARING

14
                        January 14, 2020
15                        10:02 a.m.

16

                John J. Moakley United States Courthouse
17                      Courtroom No. 17
                        One Courthouse Way
18                  Boston, Massachusetts  02210

19

20
                      Linda Walsh, RPR, CRR
21                    Official Court Reporter
            John J. Moakley United States Courthouse
22              One Courthouse Way, Room 5205
                  Boston, Massachusetts  02210
23                  lwalshsteno@gmail.com

24

25

```
 1    APPEARANCES:

 2    On Behalf of the Government:

 3         UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Kriss Basil
 4         One Courthouse Way, Suite 9200
           Boston, Massachusetts 02210
 5         617-748-3387
           kriss.basil@usdoj.gov
 6
           US DEPARTMENT OF JUSTICE
 7         By: Elina Rubin Smith, Esq.
           1400 New York Avenue NW
 8         Washington, DC 20005
           202-616-1617
 9         elina.rubin-smith@usdoj.gov

10    On Behalf of the Defendant Joseph Baptiste:

11         FICK & MARX LLP
           By: William W. Fick, Esq.
12             Daniel N. Marx, Esq.
           24 Federal Street, 4th Floor
13         Boston, Massachusetts 02110
           857-321-8360
14         wfick@fickmarx.com
           857-321-8360
15         dmarx@fickmarx.com

16    On Behalf of the Defendant Roger Richard Boncy:

17         GREENBERG TRAURIG, P.A.
           By: Jared E. Dwyer, Esq.
18         333 S.E. 2nd Avenue
           Miami, Florida 33131-3238
19         305-579-0564
           dwyerje@gtlaw.com

20


21


22
                   Proceedings recorded by sound recording,
23                  produced by computer-aided stenography

24


25
```

```
1                              INDEX

2    WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3    DONALD LaROCHE

4        By Mr. Fick              24              132
         By Ms. Rubin Smith               79
5

6                         E X H I B I T S

7

8                         DESCRIPTION            RECEIVED

     GOVERNMENT EXHIBITS
9
         3     Reverse proffer dated May 2, 2016..............   84
10
         4     Notes........................................   88
11
         5     Billing records..............................  104
12
         6     Superseding Indictment.......................  112
13

14                        DESCRIPTION            RECEIVED

15   DEFENDANT EXHIBITS

16       1     Binder.......................................   21

17       2     E-mail with attached jury instructions........   71

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Court is in session.  Please be seated.
 3              THE COURT:  Give me a second.  Let me get organized
 4   here.
 5              Basically you're standing like you have something to
 6   say.
 7              MR. BASIL:  Your Honor, I expect that in a moment
 8   Ms. Folan will ask us to state our names for the record.  And I
 9   just remain standing because I sit too long.
10              THE COURT:  Okay.  Look who's here today.  This must
11   be a big day.
12              MR. DWYER:  It is, Your Honor.  Good morning.
13              THE COURT:  Go ahead and call the case, please, Karen.
14              THE CLERK:  This is Criminal Matter 17-10305, *United*
15   *States versus Joseph Baptiste, et al.*
16              Will counsel identify themselves for the record.
17              MR. BASIL:  Good morning, Your Honor.  Kriss Basil for
18   the United States.
19              MS. RUBIN SMITH:  Good morning, Your Honor.  Elina
20   Rubin Smith for the United States.
21              MR. FICK:  Good morning, Your Honor.  William Fick for
22   Dr. Baptiste.
23              MR. MARX:  Good morning, Your Honor.  Daniel Marx for
24   Dr. Baptiste.
25              MR. DWYER:  Good morning, Your Honor.  Jared Dwyer on
```

1    behalf of Mr. Boncy, who is not here today.

2        THE COURT:  I'm going to let you do what you want to

3    do today, but just for starters, on the e-mails from the other

4    day, you got my order.  We -- it is impossible not to conclude

5    after reading those e-mails that Mr. Hinton was in fact

6    functioning as a lawyer with regards to the representation.

7    Some of the e-mails were copied to Mr. Hinton's wife, and it

8    seems that those have lost any privilege protection as a result

9    of the forwarding, but I didn't want to order their disclosure

10   until I gave you a chance to respond to that.

11       Mr. Marx?

12       MR. MARX:  Thank you, Your Honor.  So our bottom line

13   position with respect to Arielle Hinton is she's in the same

14   position as Jason Hinton for the following reasons --

15       THE COURT:  She's working for the State of Maryland,

16   and she's working for Mr. Baptiste?

17       MR. MARX:  She's not working, she's not engaged, she's

18   not retained to serve as counsel.  However, our view is the law

19   of privilege only requires that a communication be to a lawyer

20   for the purposes of getting legal advice or information,

21   however general, and that there's an expectation that it's

22   going to be kept confidential.  That was the role essentially

23   that Mr. Hinton was playing at trial when from time to time he

24   gave legal advice or participated in strategy discussions with

25   Attorney LaRoche and Dr. Baptiste, and the same goes for his

1    wife.  She's a lawyer.  From time to time they had

2    conversations.  I think the documents make clear she would

3    sometimes provide her perspective or suggestions or legal

4    advice.  The expectation was those communications were always

5    amongst that small group that participated in strategy

6    conversations, and those would be kept confidential.

7         THE COURT:  She has to be representing him.

8         MR. MARX:  I don't know that that's right, Your Honor.

9    Someone doesn't need to be formally engaged or retained for the

10   purposes of having a privileged conversation.  In other words,

11   if someone calls me and asked me a question about family law,

12   which is something I know nothing about, I can have a

13   conversation with them, and simply the fact that they're

14   reaching out to me to talk as a lawyer who may be able to

15   provide general advice about legal problems, may be able to do

16   some high-level research even though it's not my area of

17   expertise, and even though I'm never engaged or retained, I

18   think the law is clear that the privilege would apply to those

19   communications.

20        THE COURT:  I'm just not sure that's true.  You think

21   if you bump into someone at a cocktail party and you have

22   chitchat about their will, that that's a privileged

23   conversation?

24        MR. MARX:  Well, I think it's a great question because

25   it shows how different the circumstances we are dealing with

1    are.  I think cocktail conversation, it's very hard to say

2    there's any expectation that you're having a meaningful

3    conversation with a lawyer in the hope of getting legal advice

4    in circumstances that you expect to be kept confidential.

5    That's never what happened here.  These are conversations that

6    are held amongst a very tight group of people who are lawyers,

7    Attorney LaRoche, Jason Hinton, and Arielle Hinton.  And I just

8    add, to the extent that Arielle Hinton was involved in

9    conversations, those were all conversations her husband was

10   also involved in.  So they are lawyers having private

11   conversations with the defendant immediately before and during

12   a criminal trial.  This is not chitchat at a cocktail party.

13            THE COURT:  I just have to ask.  Do you and your wife

14   have those conversations?

15            MR. MARX:  First of all, my wife is not a lawyer.

16            THE COURT:  My husband is a lawyer, and we work

17   superhard at not having those conversations because we both

18   believe it destroys the privilege.

19            MR. MARX:  Well, that may be.  My wife is a social

20   worker so I don't --

21            THE COURT:  Hold on.  Mr. Basil?

22            MR. BASIL:  Good morning, Your Honor.

23            THE COURT:  Do you and your wife have those

24   conversations?

25            MR. BASIL:  No.

1          THE COURT:  Why not?

2          MR. BASIL:  It's for the privilege, Your Honor.  She

3    doesn't -- there are times, Your Honor, I confess, she asked me

4    what I did today, and I have to say legal work because I have

5    gone before the grand jury.  I can't tell her anything about my

6    legal work, any conversation.

7          For what it's worth, Your Honor, I have to say that I

8    agree with my good friend Dan Marx that to the extent Arielle

9    Hinton is providing this legal advice, she is one of the

10   attorneys.  I think that this Court, to understand ineffective

11   assistance in this case, has to consider the whole context of

12   legal advice that that man was receiving.  That means Jason

13   Hinton as a lawyer, that means Arielle Hinton as a lawyer.

14         THE COURT:  So you're going to agree without me having

15   to decide that the conversations between the Hintons and

16   Mr. LaRoche and Dr. Baptiste are privileged?

17         MR. BASIL:  Your Honor, well, first, I don't really

18   have -- let me take a step back.

19         The government has all along objected to the procedure

20   here.  Your Honor has discussed with us in court that we are on

21   unknown ground, and we're going very carefully in baby steps

22   and trying to create a record very carefully, and I appreciate

23   that.

24         The objection from the government is that we are in

25   effect proceeding blind on many, many things.  Now, we have

1    seen a remarkable evolution with respect to Mr. Hinton's role

2    in this case.  When Mr. Marx first addressed this Court,

3    Mr. Hinton was just a witness, then he was a legal assistant,

4    now he's an attorney providing legal advice.  From the log we

5    see it goes all the way back to 2017.  We don't have any of

6    those communications.

7          Clearly, if that man back there is going to testify

8    about his communications with Mr. Baptiste, his client

9    apparently, those should be within the scope of a waiver.  We

10    don't have them.  Where are the communications from

11    Mr. LaRoche?  We don't have those either.  And I should say

12    something about that in a moment, Your Honor.

13          But we are proceeding blind.  I don't know what's in

14    the communications with Arielle Hinton.  I see handwriting that

15    appears to be what I would characterize, and forgive the gender

16    bias, a woman's handwriting on the jury instructions.  Is that

17    Arielle Hinton's handwriting?  Was she providing legal advice

18    on that?  That's part of the legal team.  One of their claims

19    is that Mr. LaRoche wasn't helping with the jury instructions,

20    but we have these two other attorneys helping on the jury

21    instructions.  We should be entitled to see that.  We are, Your

22    Honor, blind.  We don't have these records.  We don't think

23    that we have all of Mr. Baptiste's e-mails.

24          Your Honor, just so we -- I'll run through all of my

25    issues very quickly and then come back to Arielle.

1          THE COURT:  I know what all the issues are, Mr. Basil,

2      but is it you are going to feel better for reiterating them all

3      at once because I'll let you do it.  I get the issue.

4          MR. BASIL:  I understand.  I am going to move on from

5      this particular issue.  I just want to address something --

6          THE COURT:  Because you understand that you are

7      winning on that issue, and you still felt compelled to like --

8          MR. BASIL:  Yes, Your Honor.  I, as the Court is

9      aware, I know that we are building a record here, and I'm

10     seeking to put on the record the United States' concerns.

11     That's the sole purpose.

12         THE COURT:  I thought you were about to put on the

13     record that you actually agreed with me or something, but no.

14         MR. BASIL:  Your Honor, I agree with you about many

15     things.  It turns out in this particular instance I want to

16     just inform the Court because the Court gave me a very strict

17     instruction about conversations with Mr. LaRoche, and I want to

18     just tell the Court what happened so the defense counsel knows.

19         THE COURT:  Hold on.  Hold on.  I first want to deal

20     with these e-mails, and then we will get to the next step.  So

21     back to my original question.

22         Is it your position that she was functioning -- okay.

23     So the situation is her husband is functioning as a lawyer?

24         MR. BASIL:  Yes.

25         THE COURT:  Mr. LaRoche is functioning as a lawyer?

1          MR. BASIL:  Yes.

2          THE COURT:  The husband is copying her on various

3    things about which she is providing comment and advice at the

4    same time as she's employed by the State of Maryland?

5          MR. BASIL:  Your Honor, I don't believe that her

6    violations of Maryland state conflict of interest laws, whether

7    she disclosed this to her superiors, whether she had any

8    clearance to do so, that may create, I have no idea, some

9    liability for her.

10          THE COURT:  My question is, I am wondering whether the

11    privilege is voided by the copying to his wife.  You seem to be

12    taking the position that it does not affect privilege because

13    she, too, is functioning as a lawyer on that team?

14          MR. BASIL:  Your Honor, what I'm saying is

15    provisionally, based upon my knowledge of this, which is the

16    log alone, I can't do a privilege analysis because I can't see

17    those communications yet.  Based on the log alone and based on

18    what I take to be Mr. Marx's good-faith assertion that it is in

19    fact legal advice that was sought and obtained by his

20    client --

21          THE COURT:  It's definitely legal advice.  I just told

22    you that.

23          MR. BASIL:  Then she would also be acting as an

24    attorney.  We are all aware in the legal community of husband

25    and wife teams.

1          THE COURT:  So he's going to concede the privilege

2    issue for present purposes.

3          Now, he has not read these e-mails, as he's told us

4    three times this morning and will probably tell us another half

5    dozen times, but I have read them now.  And they cover a broad

6    swath, right, things like openings, closings, jury

7    instructions, investigation, et cetera, et cetera.  So now that

8    I've seen them, you're -- some of those -- some of the claims

9    that you've made are not going to be possible without a waiver

10   of those issues, okay?

11         MR. MARX:  Understood.  That's why we said in our

12   submission, Your Honor, our primary concern is not somehow

13   keeping those documents back from the government's team in this

14   particular case.  I think it's important that we all are on the

15   same page, which it seems we are now, that they are in fact

16   privileged communications.  I think we're now working under a

17   rubric where the defendant is pursuing an ineffective

18   assistance claim for which the Court will find an implied

19   waiver is necessary to proceed.

20         He's willing to make that waiver, but we ask, and I

21   think this is consistent with the conversations we've had twice

22   now when we talked about the basic ground rules for this

23   proceeding, is that to the extent that those privileged

24   communications are disclosed for the purpose of pursuing this

25   particular ineffective assistance claim, that there be rules

1    regarding that disclosure.  I'll let Your Honor address whether

2    it taints this team and its ability to participate in a future

3    case and certainly --

4         THE COURT:  I'm not going to make that determination

5    as to them or as to me at this point.  We'll see how it goes.

6         MR. MARX:  But certainly I think, and this has been a

7    subject of some contention between counsel for both sides, we

8    think a protective order is appropriate so that it's clear to

9    everyone, to the extent those communications are revealed

10   during this hearing and for the purpose of litigating this

11   hearing, if we're successful and Your Honor does order a new

12   trial, they can't be used in the future as part of the

13   government's case against Dr. Baptiste, and I think that's an

14   important distinction.  I think it's grounded in the law, that

15   they've articulated a reason why that wouldn't be appropriate,

16   and subject to that, we don't have any real concern with a

17   finding of implied waiver and its disclosure of those

18   communications.

19        THE COURT:  All right.  So it seems to me, on the one

20   hand, that a request for a protective order is reasonable.

21   I'll hear from them in a minute on that.

22        Also, having read the e-mails and the submissions, I'm

23   not sure -- I'm not sure what you're contemplating in there

24   that would be usable at a future trial.  Are you -- do you have

25   something specific in mind or is this sort of a prophylactic

1 | role?

2 |         MR. MARX:  I think it's prophylactic.  These are smart

3 | lawyers and aggressive lawyers, and I'm sure they can find ways

4 | to use material conversations the client had, whether they're

5 | admissions, concessions, what have you, and we think as a

6 | prophylactic matter, at a minimum, they should be used for the

7 | purposes of this proceeding only.

8 |         THE COURT:  Just so we're clear, there's not like a

9 | smoking gun kind of thing in these e-mails?

10 |         MR. MARX:  I think that's right, Your Honor, which is

11 | why, from our perspective, this is much ado about nothing.  I

12 | don't say that to be critical.  They haven't seen the

13 | documents.  They don't know but --

14 |         THE COURT:  You bear as much responsibility for the

15 | ado about the nothing as they do, right?  You could have done

16 | this implied waiver weeks ago when it first came up.

17 |         MR. MARX:  I agree.  This is not a case where we have

18 | a confession that is being withheld that will be disclosed as a

19 | result of an implied waiver.  I completely agree, Your Honor.

20 |         THE COURT:  All right.  Now, I'm prepared to give you

21 | the notebooks.  What do you want to do?  They're not long.

22 | They're not going to take you long to read through.  You want

23 | to take a recess before we start?  You want to get started

24 | while we're here?

25 |         MR. BASIL:  Your Honor, I want to know if we have

1    anything from Mr. Hinton within that scope.  I want to know

2    whether we have everything from Arielle Hinton that's within

3    the scope.  I want a representation from defense counsel that

4    they turned everything over, that we've obtained everything.  I

5    want to know if we have all of Mr. LaRoche's e-mails on these

6    topics.  I don't want to go forward on 26 e-mails that we've

7    only learned about less than a week ago after they previously

8    said they didn't think there were any communications.

9              THE COURT:  We are going forward today, okay?

10             MR. BASIL:  I understand that, Your Honor.

11             THE COURT:  We can --

12             MR. BASIL:  I want to put on the record that the Court

13   is creating a prejudice against the government by proceeding in

14   this way.  We've only asked for a waiver within the scope of

15   the claims.  There's some suggestion that counsel has made, and

16   that the Court has agreed with from time to time, that somehow

17   it's aggressive for me to ask what is black letter law.  The

18   government strongly objects to --

19             THE COURT:  Mr. Basil, would you like to just retry

20   the case?  It would be quicker and it would be simpler.  And if

21   that's what you would prefer to do, we can just retry it.  I'm

22   happy to retry it, but if we're going to piece through this

23   step by step, we are going to do it my way.  We have the

24   witnesses here.  We are going to get started.  If you feel

25   prejudiced, we'll reconvene in a week or in two weeks, and we

```
 1    will keep going with this.  You are not going to be prejudiced.
 2    You are going to get access to what you're entitled to have
 3    access to.  What I'm asking you right now, and I will turn to
 4    them in a moment and ask them if they've produced everything,
 5    but in the meantime, do you want to start now and then take a
 6    recess?  Do you want to take a recess and look at the e-mails?
 7    What do you want to do?  Assuming that we are going to start
 8    today, which we are.
 9            MR. BASIL:  Your Honor, we would like to have a chance
10    to look at all of these e-mails.
11            THE COURT:  That's fine.
12            Now your turn.  Have you produced to them -- and let's
13    go one at a time.  Have you produced to them everything that's
14    in Mr. LaRoche's file relative to this waiver issue.
15            MR. MARX:  Yes, Your Honor.
16            THE COURT:  Everything in his file?
17            MR. MARX:  That we have, yes, Your Honor.  We've asked
18    him if he's given us everything.  He says yes, and everything
19    we have, we've turned over to the government.
20            THE COURT:  So you can cross-examine him on that on
21    the stand.
22            MR. BASIL:  Your Honor, on that point, we have spoken
23    to Mr. LaRoche three times at this point, the first time to set
24    up a meeting.  He said he wanted a lawyer.  We stopped talking
25    to him in December.  The second time was last Friday.  It was a
```

1    conversation with him on the phone.  It was broken up.  He

2    again said he wanted a lawyer but couldn't afford one.

3            And we spoke to him yesterday, and during the course

4    of the conversation yesterday, Mr. LaRoche did not say that he

5    had in fact produced all of his e-mails.  And, in fact, he told

6    us that after he spoke with Mr. Fick -- Mr. Fick and Mr. Marx

7    in the summer, Mr. LaRoche destroyed his work product and his

8    notepads, like my notepad, handwritten notepads that had to do

9    with this case because he felt they weren't relevant to the

10   ineffective assistance of counsel claim.  That's what he said

11   yesterday.

12           THE COURT:  And you can cross-examine him on that.

13   He's saying he has everything.  He's turned it over.  All

14   right.

15           Mr. Hinton, the same question?

16           MR. MARX:  So the universe of material that we have in

17   our possession from Mr. Hinton are the e-mails that we've

18   submitted to the Court for in camera review.  That's it, Your

19   Honor, and those are turned over.

20           THE COURT:  Have you asked him for everything?

21           MR. MARX:  No, Your Honor.

22           THE COURT:  Why?

23           MR. MARX:  Because we don't think we have -- he has

24   any obligation to turn that over to us, and we don't have any

25   authority to demand it of him.  Attorney LaRoche is prior

1    counsel.  He had a client file.  As he's ethically obligated

2    to, he turned it over to us.  He represented it was complete at

3    the time.  We accepted that representation, and you know, if it

4    is, it is.  If it's not, it's not.  It's beyond our control.

5    But there is no client file per se to collect or demand from

6    other people who happen to be lawyers who may have participated

7    in occasional conversations.  So, no, we haven't --

8              THE COURT:  This was more than occasional

9    conversations.  We've already agreed this morning he was

10   functioning as an attorney.  So somebody, either them or you,

11   are going to ask him what else he has that hasn't been turned

12   over because he's -- he wrote this affidavit.  They're entitled

13   to punch at the veracity of the affidavit based on the records.

14             And, look, these -- there was a defense made in this

15   case and thought given to a defense based on the documents that

16   I already have.

17             MR. MARX:  Uh-huh.

18             THE COURT:  So what about Arielle Hinton?

19             MR. MARX:  So, Your Honor, this is really a new issue

20   from our perspective, and we didn't know that the government

21   would consider her so important as far as her perspective.  I

22   think she's a very marginal figure with respect to the

23   development of a substantive record that will allow the Court

24   to decide whether a new trial is needed here.  But no, we

25   haven't had -- we haven't made any effort to obtain documents

1    from Arielle Hinton that may be relevant to claims in this

2    case.

3              THE COURT:  All right.  Is she here?

4              MR. MARX:  No, Your Honor.

5              THE COURT:  Is Mr. Hinton here?

6              MR. MARX:  Yes, he is.

7              THE COURT:  We'll start with what we have.  You have

8    copies of these e-mails for him?  I am pulling my stickies off

9    so I can make my copy available.

10             MR. MARX:  I do, Your Honor.  I have a complete binder

11   set.  Do you want me to excerpt it pursuant to the order or

12   pass it up to the bench?  I'm happy to proceed however you'd

13   like.

14             THE COURT:  I have -- this is my notebook.  I've

15   pulled off my stickies.  It's just the way you gave it to me.

16             MR. MARX:  I have a duplicate copy.

17             THE COURT:  How many copies do you want?  Two?

18             MR. MARX:  I am happy to share mine, Your Honor.

19             THE COURT:  I can give them mine, too.  How long do

20   you want for a recess?

21             MR. BASIL:  Say half an hour at least, Your Honor.

22             THE COURT:  Let's come back at 11:00 and see where we

23   are, okay?

24             THE CLERK:  Court is in recess.

25             (Recess taken from 10:22 a.m. to 11:02 a.m.)

1          THE COURT:  Do you need more time or has half an hour
2     been enough?
3          MR. BASIL:  We've had a chance to scan the documents,
4     Your Honor.  To fully digest them would take more time.  I
5     anticipate, based on what we see here, that the
6     cross-examination of Mr. Hinton is going to be extensive and
7     lengthy.  I don't know if we'll finish today.  I have to go
8     through every single one of these documents, and I'm just
9     seeing them now.  I expect that we will need to subpoena
10     Arielle Hinton to come here and treat her as an adverse
11     witness.  We'll have to subpoena Eric Walcott here and take him
12     as a witness.
13          I mean, I should hand this back.  Do you have a copy,
14     Mr. Marx?  This one is unmarked.  I have marked a copy, Your
15     Honor.  We're going to ask -- so I marked one.  I was trying to
16     take notes quickly.  We'd like to have all of the documents
17     that were submitted marked as an exhibit to be part of the
18     record.
19          THE COURT:  Why don't we just mark the notebook.
20          MR. BASIL:  So we can mark -- my copy now has some
21     notes in it.
22          THE COURT:  You had three.  You gave him back one.
23     That leaves you two.  One you put notes on.  Is the other
24     clean?
25          MR. BASIL:  Did you write in yours?

1          MS. RUBIN SMITH:  I did.

2          THE COURT:  Why don't you just produce another copy,

3     and we'll mark it as an exhibit.

4          MR. MARX:  Yes, Your Honor.

5          THE COURT:  Maybe the easiest thing to do is at the

6     end of the day just leave your copy.  I'm sure you can make

7     another one back at your office.

8          MR. FICK:  Does the Court still have one?

9          THE COURT:  No.  I gave him mine.  They took three:

10    Two from you, one from me.  They've made notes in two of them

11    and given yours back.  I'm willing to go without.  We can also

12    just throw it up on the ELMO.  I've read them.

13          (Defendant Exhibit 1 received in evidence.)

14          MR. BASIL:  It strikes me, Your Honor, that -- I know

15    the Court said I indicated earlier that I would belabor this

16    point.  It's certainly not my intention to belabor any point.

17    We have, based on what's in this notebook, a legal team

18    compromising of at least three people.

19          THE COURT:  Agreed.

20          MR. BASIL:  One of the attorneys is pointing --

21    there's a claim of ineffective assistance by one attorney but

22    not the others.  The Court has heard it before or observed that

23    we are in uncharted territory, and I agree with the Court.  And

24    you can see, I'm not sure what to do.  This is remarkable that

25    this -- the idea that Arielle Hinton is a marginal character.

1  That's a surprising statement.

2          THE COURT:  Why don't we -- let's get started here and

3  see what we can do.  I'm assuming Mr. LaRoche is the first

4  witness?

5          MR. FICK:  Yes.

6          MR. BASIL:  Could we have Mr. Hinton not in the room

7  while Mr. LaRoche is --

8          THE COURT:  Yes.

9          MR. BASIL:  And, Your Honor, we would like our agents

10  to be out to avoid taint, and I'll state for the record that

11  they did not review any of these e-mails.  To the extent that

12  the Court or the defense team claims that someone is tainted,

13  it is me.

14          THE COURT:  So they are representing that their agents

15  haven't looked at any of these e-mails.  At this point they're

16  anticipating the possibility that if the case needs to be

17  retried, they can't retry it, and I'm not making a ruling on

18  that.  They're just trying to insulate themselves.  Their

19  agents are stepping out.  As far as I'm concerned at this

20  point, if the case is retried and these two can't do it, the

21  agents are still going to be allowed on the team assuming the

22  status quo, and I've removed them from the room for that

23  purpose -- I have allowed them to be removed from the room for

24  that purpose.

25          Any other sequestration requests?  The agents are out.

1    Mr. Hinton is out.

2              MR. BASIL:  Not from the government.

3              MR. FICK:  No, Your Honor.

4              THE COURT:  All right.  You're going to call

5    Mr. LaRoche first?

6              MR. FICK:  Yes.

7              THE COURT:  Let's do it, over there.

8              MR. FICK:  Dr. Baptiste will call Donald LaRoche.

9              And I guess to the extent we're going to mark the

10   documents now deemed within a privilege waiver, we can use this

11   copy, and I guess we put that -- I may ask the witness about

12   some of the documents now that they're in.

13             THE COURT:  All right.  So we don't have -- you can

14   either put it in front of him and we can make do or you can put

15   it up on the ELMO and it can be projected on his screen as

16   well.

17             MR. FICK:  I think just so that there's the

18   opportunity if he needs to review it, I would give him the full

19   copy.  Put it on the ELMO -- I have one other copy for myself

20   that I can put on the ELMO for the Court.  The government of

21   course has a copy.  For the record, I can refer to individual

22   Bates numbers.

23             THE COURT:  I'm going to leave this to you, but my

24   suggestion off the cuff is that we mark the notebook as Exhibit

25   1, and we refer to the documents in there by their tab numbers

1    or their Bates numbers.

2            MR. FICK:  The Bates number would be my expectation.

3            THE COURT:  That's fine.  But everybody is okay with

4    the notebook being one exhibit?

5            MR. FICK:  I have an exhibit from the government if

6    that's satisfactory with Ms. Folan.

7            THE COURT:  That's fine.

8            THE CLERK:  That's fine.

9            Will you please raise your right hand.

10           (Witness sworn.)

11           THE WITNESS:  Yes, I do.

12           THE CLERK:  You may be seated.

13           DONALD LaROCHE, having been duly sworn by the Clerk,

14   was examined and testified as follows:

15                      DIRECT EXAMINATION

16   BY MR. FICK:

17   Q.   Good morning, Mr. LaRoche.

18           I'm just going to put on the stand here what's been

19   marked as Exhibit 1.  I may ask you some questions about the

20   contents later.  I just put it there so you can have convenient

21   access.

22           Good morning, Mr. LaRoche.

23   A.   Good morning.

24   Q.   Could you please briefly summarize your educational

25   background.

1    A.    Starting with college, I guess, I graduated from Brooklyn

2    College in or around 1997, I believe, '8.  After Brooklyn

3    College I went on to law school in Connecticut, Quinnipiac

4    University.  I graduated from there.  And in 2000 and --

5    between 2002 and 2004 I had started a master's in theological

6    studies that I did not complete.

7    Q.    Okay.  And when did you first begin work as a lawyer?

8    A.    I started working as a lawyer in 2003, 2004, at the

9    Suffolk County District Attorney's Office in the appellate

10   unit.

11   Q.    Here in Massachusetts?

12   A.    In Massachusetts, yes.

13   Q.    What was your next position after the Suffolk DA's office?

14   A.    So from 2003 -- I believe 2003 to 2007, I went from being

15   an appellate attorney to a line ADA in West Roxbury District

16   Court as well as Dorchester District Court.  It started with

17   Dorchester and then went on to West Roxbury.  After that I left

18   out of there in September 2007, and I joined the Federal Court

19   in the clerk's office as a courtroom deputy for Magistrate

20   Judge Joyce Alexander Ford.

21   Q.    How long did you work for the Court?

22   A.    From 2007 until July of 2012 I worked for the courthouse,

23   and then in June of 2012 I opened up my own practice.

24   Q.    I'm sorry.  You said you went into your own practice?

25   A.    June 2012 I went into my own practice, yes, sir.

1  Q.   And you've worked in that capacity since?

2  A.   Yes, sir, as a solo.

3  Q.   And other than *United States versus Baptiste*, this case,

4  had you ever tried another Federal criminal case?

5  A.   This was my first actual full-blown trial.  I've had about

6  five or six other cases here in the courthouse in Boston, and

7  they were drug cases that resulted in a plea.

8  Q.   When did you first begin representing Dr. Baptiste?

9  A.   August of 2017.

10  Q.   And is it correct that Dr. Baptiste was then charged by

11  complaint on August 28th of 2017?

12  A.   Yes.  After I first met him, yes.

13  Q.   Who's Jason Hinton?

14  A.   Jason Hinton is a fraternity brother of mine that I met

15  actually through the process of meeting Dr. Baptiste.  I met

16  them the same day.  Actually, Jason had called me a week

17  earlier through networking, that Mr. Hinton then met with me

18  and -- he introduced me to Dr. Baptiste in Montgomery.

19  Q.   What, if any, role did Mr. Hinton have in your

20  representation of Dr. Baptiste?

21  A.   Initially, really none.  It was just a question of

22  Dr. Baptiste and I, but because of his -- Jason Hinton, in my

23  impression, he had a really good sense of what was going on

24  with the FCPA and the situation related to Dr. Baptiste, that I

25  then started leaning towards him for a lot of sort of -- like a

1  guide because of his knowledge in the area.

2  Q.    So just to be clear, you understand that Mr. Hinton is a

3  lawyer, correct?

4  A.    I do.

5  Q.    Do you know where he's admitted?

6  A.    I believe he's admitted in Maryland and also New Jersey.

7  Q.    So as I think you were testifying, it's fair to say you

8  had various communications with Mr. Hinton and Dr. Baptiste

9  about the facts and law connected to this case?

10  A.    Through the course of representing Dr. Baptiste, yes.

11  Q.    Fair to say you wanted his input and advice?

12  A.    Yes.

13  Q.    To your knowledge -- well, who is counsel of record in

14  this case, to your knowledge?

15  A.    I've always been the sole counsel of record.

16  Q.    Who is Arielle Hinton?

17  A.    That's Jason's wife.

18  Q.    Is she also a lawyer?

19  A.    She is an attorney, yes.

20  Q.    And so was she sometimes included on communications among

21  you, Mr. Hinton and Dr. Baptiste?

22  A.    To the extent that as husband and wife, and Arielle is

23  also friends with the Baptiste family.  There have been certain

24  communications that I guess in the circle of -- among the

25  circle of friends that she did have a chance to hear what's

1    going on.

2    Q.    I mean, did she also make substantive comments about the

3    facts and law related to the case?

4    A.    Substantive comments, I can't say to what full extent.    I

5    know that given the fact that Jason and I would have

6    conversations and -- it was never really a lot of input from

7    Arielle.

8    Q.    But to the extent that she was included, what's your

9    understanding of the purpose of those -- of including her in

10   conversations?

11   A.    My understanding, like I said, when I would meet with the

12   family, and that would include Dr. Baptiste's wife, and on the

13   few occasions that Jason was available, because he was working,

14   he would be there, and Arielle would be there with her kids.

15   And, I guess, you know, you hear the conversations and -- I

16   don't mean to be evil to anybody, but what wife doesn't pop in

17   a comment or two when her husband is talking to somebody else.

18   Q.    But is it true that she also offered legal opinions and

19   comments on legal matters?

20   A.    To the extent that she could, yes.

21   Q.    Now, as the pretrial phase of this case unfolded, were you

22   able to review discovery in the case promptly and

23   contemporaneously as the government produced it?

24   A.    To -- dating back to 2017 when I first got in the case and

25   what the government provided me, when they provided and I was

1    able to open it, I reviewed it, yes.

2    Q.   When you were able to open it, did you have issues over

3    time with opening discovery in the electronic format in which

4    it was provided?

5    A.   Yes, I did.

6    Q.   Can you describe those problems or issues.

7    A.   Well, the biggest problem I had was the thumb drives that

8    the government initially provided didn't open on my computer,

9    and so at that point I made attempts and efforts to try to

10   figure out how to open it, but I didn't always -- I wasn't

11   always successful.

12   Q.   Do you recall sending written communications to the

13   government about these problems?

14   A.   Not at first.  I think it took a while before we actually

15   confronted this issue here in the courthouse before Magistrate

16   Judge Kelley.  By then it was -- Attorney Frank was on the

17   case, and I made bones about the fact that I couldn't open up

18   the discovery that they provided.

19   Q.   Mr. LaRoche, I'm going to ask you to open the binder to

20   the pages that are Bates stamped at the bottom BAP 937 to 940,

21   and I'm also going to put the first page of that up on the

22   screen.

23             MS. RUBIN SMITH:  What tab?

24             MR. FICK:  I actually don't know what tab.  I only

25   have the Bates number.

1   Q.   I'm showing you an e-mail chain and attachments.  The top

2   e-mail here is dated February 27th, 2018.  Do you see that?

3   A.   Yes, sir.

4   Q.   And do you see attached to it, and this is now Bates

5   number 939 to 40, a letter dated February 23rd, 2018, from you

6   to Mr. Frank?

7   A.   Yes, sir.

8   Q.   And is this one of the communications we described where

9   you were -- we just talked about where you were expressing --

10  explaining you were having difficulties opening the discovery?

11  A.   Yes, sir.  This is exactly it.

12  Q.   Okay.  And after you sent this letter in February 23rd,

13  2018, did -- well, at what point, if any, did you eventually

14  get discovery that you could open?

15  A.   To the best of my recollection, it would have been the

16  next time that I was up here in Boston.  And I don't remember

17  the exact month, but it was right around this time

18  that before -- we were before Magistrate Judge Kelley in one of

19  the conference hearings that I raised the issue, and it was

20  resolved that day to a certain extent.

21  Q.   What do you mean to a certain extent?

22  A.   When I say to a certain extent, the government realized

23  that whatever they provided me was -- I was having difficulty

24  opening it.  They realized that that was happening so they made

25  arrangements to have me go up to the ninth floor, and the IT

1    department then assisted me in getting another thumb drive that

2    had another link that opened up the CDs and what have you, the

3    thumb drive they provided me.  So it was all in that same day,

4    but it just took a whole day of work in trying to fix that.

5    Q.   Can you remember roughly temporally when that occurred?

6    A.   It was the beginning of 2018, and it was around this time

7    that I wrote this letter that I came -- traveled up to Boston,

8    and they assisted me.

9    Q.   So once you had a complete set of the discovery that you

10   could open, did you ever provide a complete set of that

11   discovery to Dr. Baptiste?

12   A.   To my recollection, I printed what I could print, if

13   I'm -- I'm not exactly 100 percent certain.  The reason I say

14   that is it's been a while.  But I did provide some of the

15   documents that I was able to get to him, but I know it wasn't

16   the full extent of what they provided me.  So I handed -- I

17   vaguely remember handing it to him with the other thumb drive

18   to open it.  I'm not 100 percent certain.  I apologize for

19   that.

20   Q.   When you say documents, now the discovery -- it's correct,

21   right, the discovery consists of both documents and various

22   kinds of recordings?

23   A.   Right.  And I tried to watch -- again, my memory is that I

24   tried to watch some of it with Dr. Baptiste, and both he and I

25   have two different types of computers.  He has an Apple.  I

1    have the other one, the -- I have a Dell.  And I know

2    around -- my memory is around that time I went to his house,

3    and we both tried to open it on both his Apple and on my

4    computer.  And to the extent that we were able to -- I know we

5    maybe watched one or two of the videos, not all of them.

6    Q.    What do you mean to the extent to which you were able?

7    A.    Because, again, he tried it on his Apple.  It didn't work.

8    And then I tried it on mine, and I know I was able to see one

9    or two of the initial meetings here, the meeting in

10   Boston -- his very first meeting in Boston, I was able to watch

11   some of that with Dr. Baptiste, but it wasn't, again, not to

12   the full -- I can't say it was the full -- whatever they

13   provided me wasn't the whole entire thing because a lot of

14   times my visits to Dr. Baptiste were short-lived because of

15   other responsibilities I had.

16   Q.    Okay.  But just to -- well, let's talk about this one

17   meeting now that you're remembering where you say you watched a

18   video or two; is that a fair characterization of what you said?

19   A.    That would be fair.

20   Q.    Do you remember when that was?

21   A.    That would have been early in 2018.

22   Q.    Was Jason Hinton there?

23   A.    Not to my recollection.  A lot of times it was just

24   Dr. Baptiste and I, and -- because I had -- I had problems

25   keeping my meetings -- my appointments with Dr. Baptiste in

1    Maryland because, again, I live in Virginia and he lives in

2    Maryland.  And a lot of times I would make arrangements or

3    appointments to go see him, and I wouldn't be able to always

4    keep them.  So I can't remember exactly what was going on in

5    2018 at that time.

6    Q.    Other than this meeting that you described, did you in

7    fact ever send or leave with Dr. Baptiste a complete openable

8    set of the discovery?

9    A.    I left what I could, and if I had the problem that I had,

10   I believe he would have had the same problems because, again,

11   like I said, he had an Apple, and the stuff that I had was for

12   the Windows, but I described it to him as best as I could.

13   Q.    Now, the discovery consisted of a large number of both

14   audio and video recordings; fair to say?

15   A.    Correct.

16   Q.    Undercover meetings that were recorded, yes?

17   A.    Correct.

18   Q.    Wiretap recordings for several months of a number of

19   phones?

20   A.    Correct.  Now, with respect to the wiretaps, I wasn't

21   always successful to open those for Dr. Baptiste.

22   Q.    Okay.  And in addition to the wiretaps, there were also

23   some various consensual recordings, where one party consented

24   to a conversation that was recorded, right?

25   A.    I believe so, yes.

1  Q.   Do you have a rough memory or idea of the total number of

2  hours of recordings that were produced in the discovery?

3  A.   No, I do not.

4  Q.   If I suggested it could have been over 100 hours, does

5  that sound plausible or correct?

6  A.   Yes.

7  Q.   And some of these conversations were in Haitian Creole,

8  correct?

9  A.   Correct.

10  Q.   You understand that language?

11  A.   Yes, I do.

12  Q.   Were you able to review or listen to or view all of the

13  recordings before trial?

14  A.   I believe I did, but I can't say for certainty.

15  Q.   Did you make any notes or memos when you were listening to

16  or viewing the recordings that you did review?

17  A.   I scribbled things but nothing significant, because,

18  again, I was operating under a theory of the case that -- like

19  I said, I would listen to it, and I would write down a name or

20  two, but, again, in my legal notepads they weren't very

21  organized, and that's me doing Monday morning quarterback now.

22  Q.   Okay.  Let me ask you about a couple things about that

23  answer.  First, you talked about making some notes in legal

24  notepads.  What happened to those notepads?

25  A.   What happened, as I explained before, I had always been

1    working from home because I didn't have an office in Virginia.

2    Ultimately I do now have an office as of September of 2019.

3    But at the time I worked primarily from home, and I moved --

4    during the course of representing Dr. Baptiste, I moved three

5    times from my first apartment in Virginia, and then I moved up

6    the street, up and across, up the street from where I first

7    lived.  I went from a second-floor apartment to a first-floor

8    apartment in the same complex, and then I moved out of that

9    complex to the home that I have now.  So I've moved several

10   times.  In the process of moving, some things were misplaced is

11   the best way I could say it.

12   Q.   Okay.  And so any notes that you may have made about

13   recordings that you listened to before trial, did you have

14   those at the time of trial?

15   A.   I had -- at the time of trial I came up here with a big

16   suitcase of -- briefcase of materials, and the number of legal

17   pads that I had were all intertwined and mixed up with other

18   matters that I was dealing with at the time.  So I had a set of

19   legal pads that I was using for Dr. Baptiste, but they got

20   mixed up together.

21   Q.   Well, let me ask it a different way.  To the extent you

22   wanted to consult notes about a recording during the trial,

23   would you have been able to find those notes?

24   A.   I had a method, and the things that I felt were critical

25   to the angle that I was taking in his defense, I grouped those

1  together, but then there were times when I'd figure something
2  out and I would just randomly just write into a notebook.
3  Q.   Another thing about your prior answer, I think you said
4  something like -- and correct me if I'm wrong -- I would make a
5  couple of notes based on my theory of the case or informed by
6  my theory of the case.  Did you say something like that?
7  A.   Yes, sir.
8  Q.   What did you mean by that?
9  A.   Whenever I was able to open up one of the thumb drives or
10 the CDs provided to me by the government, I would have a
11 conversation with Dr. Baptiste, and that would sort of
12 coordinate or direct me to a thinking of how to present his
13 defense.  And I wouldn't write down a novel of notes.  I would
14 just jot something down and have a conversation with him, and I
15 would try to gear my thinking that way.
16 Q.   How many such conversations or meetings about recordings
17 did you have with Dr. Baptiste before the trial?
18 A.   I don't know the exact number.
19 Q.   And did you record all of your meetings with Dr. Baptiste
20 in like a time-keeping record or billing record or anything?
21 A.   I did not.
22 Q.   I'm sorry?
23 A.   I did not.
24 Q.   You did not.
25          Were there recordings that you heard for the first

1    time during the trial?

2    A.    During the trial, I'm not sure that I heard things for the

3    very first time.  That was not my issue at trial.

4    Q.    So what was your issue at trial?  I'm trying to -- just

5    explain that answer.

6    A.    Okay.  There was the issue of, for example, certain

7    documents that were coming out, and I had not had a chance to

8    thoroughly review the documents, A, related to Dr. Baptiste's

9    bank records.  I had them.  I had the bank records.  I just

10   didn't go through them as thoroughly as I thought I had to go

11   through them.  There was an issue of photos that the government

12   used during their opening.  I'd seen that a couple of weeks

13   earlier, but, again, in talking to Dr. Baptiste the week of

14   trial, in certain discussions I was having with him, I was

15   just -- my impression was that it was not as critical as the

16   government was able to argue it in front of the jury.

17   Q.    What was not as critical?

18   A.    The photos of -- there was a picture of -- to my

19   recollection, there was a picture of cash on the table with no

20   one -- Dr. Baptiste was not figured in the pictures, but my

21   understanding later on was that it was from his phone that they

22   acquired that, and I don't think I had enough information to

23   really use that or assist Dr. Baptiste in using that at trial.

24   Q.    I'll come back to the photos.  Still on -- on the topic of

25   recordings, did the government produce some transcripts of some

1    of the recordings in the discovery?

2    A.    Later on my understanding is that they did, and I saw what

3    I saw through the process of -- I believe it was either the

4    week starting before trial or a couple of days before, one of

5    the -- somebody from the U.S. Attorney's Office came down to

6    me, and I was sitting out here in the hallway.  And they handed

7    me a thumb drive and said hey, this is the -- everything that

8    you had been looking for or this is -- this thumb drive is not

9    encrypted.  In other words, so it was unlocked.  And I went

10   back to the hotel room that night, and I started going through

11   everything that I could go through to see what was unlocked or

12   what I hadn't already seen.  But I'd seen a lot of it already.

13   Q.    And you're talking now about transcripts?

14   A.    The transcripts, the photos, whatever was on there, I was

15   able to see, and I was trying to go through to see what I had

16   already seen.  Most of it I had already seen, but there was

17   certain things that I had not really pinpointed myself on.

18   Q.    Okay.  Now, is it fair to say that of the voluminous audio

19   and video recordings, only a small proportion were transcribed

20   and produced by the government in advance?

21   A.    I believe in the month, either April or May of 2019, I

22   received -- I would receive a slew of e-mails directing me to

23   where everything was, and I was trying to operate that and

24   organize that.

25   Q.    What I'm really trying to ask, though, is just your

1   understanding of, you know, if there's wiretaps and consensual

2   recordings and videos of meetings, is it fair to say that only

3   a small proportion of those things were transcribed by the

4   government and the transcripts produced to you?

5   A.   I would agree, yeah.

6   Q.   Did you have transcripts made of any of the recordings

7   that were not transcribed by the government?

8   A.   No, I did not.

9   Q.   I would like to show you another document from the package

10  in front of you.  It's marked 959 to 970.  Did you have a

11  chance to look through that briefly?

12  A.   959 to 970?

13  Q.   Yes.

14  A.   (Witness reviews document.)

15  Q.   I don't need you to read the whole thing.  Are you

16  generally familiar with this document?

17  A.   Yes, yes.

18  Q.   So looking at the top, the first page of the document,

19  959, this is an e-mail from you to Mr. Hinton and Mr. Baptiste

20  dated May 20th of 2019.  Do you see that?

21  A.   Yes.

22  Q.   And so May 20th, that's like a couple of weeks before the

23  trial started, I think, on June 10th; is that fair?

24  A.   Yes.

25  Q.   And in this e-mail you've sent along an attachment which

1    is a transcription, presumably provided by the government, of

2    one of the conversations at issue in the case, correct?

3    A.    Correct.

4    Q.    Okay.  And in the e-mail you say to Joe that you

5    actually -- as of the time you sent the e-mail, you had not

6    found the actual audio recording that the transcription is of;

7    is that right?

8    A.    Correct.

9    Q.    Do you know whether before trial you were ever able to

10   locate the recording that goes along with this transcription?

11   A.    Before trial, probably not.  I think it was during the

12   week of the trial that I was able to pinpoint.  Because the way

13   it was sent to me, again -- at some point or another, I believe

14   I was called inept prior to all of this, and I was having

15   difficulties finding the actual hearing -- I mean, the audio.

16   So when I found a transcript that I could read, I read it, and

17   I, like I said, I made do with what I had.

18   Q.    And this particular transcript you're sending to Joe, to

19   Dr. Baptiste, I'm sorry, May 20th, a couple of weeks before

20   trial, right?

21   A.    Yes, sir.

22   Q.    So is it correct to infer that you had not previously

23   identified that transcript or sent it to Dr. Baptiste before

24   this?

25   A.    No, I had not.  And, again, once the government was

1   sending e-mails after e-mails and I was able to open things up,

2   when I would find something, I would turn it over.

3   Q.   Okay.  So --

4   A.   I would mention it.

5   Q.   So, in any event, this is -- this particular conversation

6   that is transcribed in the attachment and as to which you

7   couldn't find the recording, that was not something you would

8   have had the ability to discuss with Dr. Baptiste earlier in

9   the case?

10  A.   No.

11  Q.   I'm sorry?

12  A.   No, sir.

13  Q.   Did it also happen that Mr. Dwyer shared transcriptions

14  with you that he had made of certain evidence in the case?

15  A.   To my recollection, no.  I believe that once Attorney

16  Dwyer got another case, our conversations were actually

17  limited.

18  Q.   Let me just see if I can refresh your memory, then, a

19  little bit and ask you some questions.

20        Let's turn to Page 1060 through 1081 of the exhibit.

21  Just take a few minutes to familiarize yourself on that, and

22  let me know when you're ready and I'll ask you some questions.

23  A.   (Witness reviews document.)  Okay.

24  Q.   So is it fair to say -- you see in the middle of the page

25  there is an e-mail from Mr. Dwyer to you that appears to be

1    attaching a transcript?  Do you see that?

2    A.    Yes.

3    Q.    Okay.  And so, at least on this occasion, on June 5th,

4    about five days before the trial, Mr. Dwyer shared with you a

5    transcript that I guess -- the conversation you had talked

6    about previously, correct?

7    A.    Yes.

8    Q.    And then you in turn shared that with Mr. Hinton and

9    Dr. Baptiste, correct?

10   A.    Correct.

11   Q.    And then at -- and then at the top there's an e-mail from

12   Arielle Hinton that says, "Well, as a prosecutor I would use

13   that, too.  Have you spoken to Joe about this communication?

14   Have you heard the recording?  Has Joe?"  Do you see that?

15   A.    Uh-huh.

16   Q.    Sitting here today, do you know what the answers to those

17   questions are?  Before you got the transcript from Mr. Dwyer,

18   in other words, had you focused on this recording or discussed

19   it with Joe or Jason?

20   A.    Just give me a moment.  Let me take a look at this.

21          Given the date, Mr. Fick, I don't believe that I was

22   even -- I would have had to have had a conversation with him on

23   the phone because in or around June 5th my daughter -- my

24   oldest daughter was graduating from college in New York.  So I

25   was down in New York dealing with that.  And my two children,

1    the next the day or the day after, were in promotion ceremonies

2    in their school in Virginia where I live.  And so to answer

3    that did I have a chance to talk to Joe about this specific

4    point that Mrs. Hinton raises here, if there's no reply copy

5    here, then I probably did not.

6    Q.    All right.  Let's look at the third page of the exhibit,

7    this piece of the exhibit, 1062, the cover of the transcript;

8    do you see that that's a transcript prepared by a private

9    transcription service?

10   A.    Yes, sir.

11   Q.    Is it your understanding that this is something that

12   Mr. Dwyer had transcribed and then in turn shared with you?

13   A.    Yes.

14   Q.    Okay.  And what I was trying to get at with my prior

15   question, and perhaps I didn't ask it very artfully, was

16   putting aside your getting this transcription from Mr. Dwyer,

17   was the underlying recording itself something of which you were

18   aware or had discussed with Dr. Baptiste or Mr. Hinton earlier

19   at any time?

20   A.    I don't remember.

21   Q.    I'm sorry?

22   A.    I don't remember.  If I turn -- like I said, there was a

23   lot going on, and looking at it now, trying to know when, if at

24   all, did I provide it to Joe in this conversation, I might have

25   given it to Jason, but not specifically to -- I'm sorry, I said

1    Joe -- Dr. Baptiste.

2    Q.   And temporally when might have you given it to Jason, to

3    the best you can remember?

4    A.   I guess in and around that same time that Arielle is

5    responding to me.

6    Q.   So in or around June of 2019?

7    A.   Yes, sir.

8    Q.   So is it fair to say that the underlying recording itself

9    is not one you would identify that is significant or shared or

10   talked about with Dr. Baptiste earlier, say in 2018?

11   A.   No.

12   Q.   I'm sorry?

13   A.   No.

14   Q.   No, you had not previously identified or talked about

15   that?

16   A.   No.

17   Q.   Now, I think we talked a few minutes ago about how before

18   trial the government, in addition to all the recordings, also

19   produced various kinds of documents and photographs, right?

20   A.   Yes, sir.

21   Q.   Okay.  And can you say sitting here today that you had

22   reviewed all of that material before the trial?

23   A.   To the extent that I could, I believe I did.

24   Q.   Well, what do you mean to the extent that you could?

25   A.   The things that I was able to open, I had to have had some

1    kind of conversation.  Excuse me.  I'm trying to recall all of

2    this with Dr. Baptiste, because like, again, like I said, a lot

3    of times when I was supposed to go up and meet with him, I

4    would be unavailable or unable to stop in Maryland to see him.

5    I'm not exactly sure.

6    Q.   So part of your answer I think was to the extent you were

7    able to open things, did it remain a problem, your ability to

8    open things, throughout your representation up to trial?

9    A.   I had a lot of difficulties, yes.

10   Q.   So, in other words, even after the February 2018

11   communication with the government that we talked about before,

12   did you continue to have trouble, at least to some extent,

13   opening discovery materials?

14   A.   I did -- the government would make the effort to send

15   things to me overnight express, and upon receiving it, I always

16   wondered why in sending it I'm still having an issue in trying

17   to open it.  And I was making efforts to open them, and it just

18   seems a lot of the things looked like they were a bunch of

19   logs, you know, the BAP numbers on it -- or Bates numbers,

20   sorry, on it, and I tried to piece together what I could piece

21   together.

22   Q.   Okay.  But I guess I'm trying to get at, sitting here

23   today, I mean, what can you say, if anything, about what

24   proportion of the total discovery produced you were ultimately

25   able to access before trial?

1   A.   If I'm putting a number on it, I don't know if I can put a

2   number on it.  But I know I can say this today, that I -- the

3   various -- I guess what I considered during defending

4   Dr. Baptiste, what I considered the major important meetings,

5   the meeting in Boston, the meeting in New York, the meeting in

6   Miami, I was able to identify those, open those up, look at

7   them, review them, discuss them to a certain extent with

8   Dr. Baptiste.

9   Q.   Okay.  But in addition to those meetings you described,

10  right, there were months of wiretap conversations, right?

11  A.   The wiretap conversations -- would we call that the Title

12  IIIs?  The Title IIIs, I had substantial difficulties trying to

13  open it.

14  Q.   And did those difficulties resolve before trial?

15  A.   To the extent that -- and I say to the extent to what the

16  government provided me, they ultimately provided me something

17  that was a little bit easier to access, and I was able to copy

18  it in and I was able to do this and that at the hotel the

19  weekend before.  I've seen a lot of things.  There were things

20  that I'd seen in May that opened up automatically, but the

21  weekend before the trial when I was here -- because I arrived

22  to Boston before everybody else did, I spent hours going

23  through them.

24  Q.   So here, if I'm understanding you correctly, you're

25  talking about presumably exhibits that the government gave you

1    in advance of trial, right?

2    A.    Yes, sir.

3    Q.    And so the exhibits included some of the meetings and some

4    of the wiretaps, right?

5    A.    Yes, sir.

6    Q.    But to the extent if the government didn't identify it as

7    an exhibit, had you been able to review it, listen to it

8    previously?

9    A.    Not fully.

10   Q.    Not fully?

11   A.    No.

12   Q.    Now, talking about documents specifically, did your

13   ability to review documentary evidence, in other words,

14   nonrecordings, did that suffer -- did you suffer with the same

15   kinds of difficulties you did with the recordings in terms of

16   opening the media?

17   A.    I don't know if I can say I suffered the same as I did

18   with the audios and the visuals or the documentaries.

19   Ultimately the government, like I said, opened up and provided

20   a lot of things prior to the trial.  So I received -- in

21   hindsight, I was seeing a lot of things that I was able to open

22   up in the month of May leading up, and again, I was getting a

23   lot of documents via either through the e-mail from the

24   government or I received a number of overnight express mail.

25   Q.    Okay.  And so if I'm understanding you correctly, you're

1    talking at this point about disclosures from the government

2    immediately before the trial, like a month or less before the

3    trial, right?

4    A.    Yes, sir.

5    Q.    And so at this point, I assume, right, the government is

6    disclosing things like Jencks Act materials and trial exhibits,

7    right?

8    A.    Yes, sir.

9    Q.    And fair to say that's just a small subset of the overall

10   discovery that had been provided since 2017, right?

11   A.    Yes.

12   Q.    And so is it fair -- am I understanding correctly, if it

13   wasn't included in the Government's immediate pretrial

14   disclosures, you can't say for sure you managed to open it and

15   review it?

16   A.    That would be fair to say.

17   Q.    Now, I'm going to show you a couple of photographs which

18   were introduced at trial, and at trial they had exhibit

19   numbers.  So if the Court is -- doesn't object, I'll just use

20   the trial exhibit numbers here.  It's 334 and 333.

21         So, Mr. LaRoche, I'm asking you -- I put in front of

22   you Trial Exhibits 333 and 334.  Do you see those?

23   A.    Yes.

24   Q.    Do you recognize those photographs?

25   A.    I believe this is what I was mentioning earlier.  The

1    government, if I'm not mistaken, used this -- these exhibits

2    during their opening.

3    Q.    And -- okay.

4    A.    Well, put it like this:  I'm not sure when exactly they

5    used it, but I did -- I was able to see them as part of what

6    they opened up for me in an e-mail sometime late May, if I'm

7    not mistaken, but I could have sworn this was something that

8    was -- because I remember only being able to discuss this to a

9    certain -- to edify Dr. Baptiste, was a couple of days before

10   trial and we -- he and I had a conversation about this.

11          MS. RUBIN SMITH:  Your Honor, I'm sorry.  For the

12   record, these are defense -- Mr. Dwyer's exhibits.  These are

13   not government exhibits.

14          MR. FICK:  I'm sorry.  I wasn't sure about the -- I

15   guess I was mistaken about the provenance.  My understanding is

16   that they were marked with those numbers at trial.  I stand

17   corrected if I characterized them incorrectly.

18          THE COURT:  Were they admitted at trial as 333 and

19   334?

20          MS. RUBIN SMITH:  They were admitted at trial by

21   Mr. Dwyer.  The government did not use these.

22          THE COURT:  333 and 334?

23          MS. RUBIN SMITH:  Yes.

24          THE COURT:  Okay.  That's fine.

25          MR. FICK:  For my own -- they were also included in

1    the government's opening PowerPoint?

2              MS. RUBIN SMITH:  No.  Those were different

3    photographs.  Those were photographs that were sent to the

4    undercover, Peter Anderson, taken from the log report of the

5    undercover's phone.

6              THE COURT:  The one used during the government's

7    opening was one big pile, right?

8              MS. RUBIN SMITH:  Correct, on the glass table with no

9    names.

10             THE COURT:  Yeah.

11   BY MR. FICK:

12   Q.   So with that clarification, Mr. LaRoche, do you recall

13   there being another photograph of money also that was used in

14   the government's opening?

15   A.   Right.  What the government just identified was on a

16   table, a glass table, and then -- actually, in that picture you

17   can see like -- in the picture you can see feet, like people

18   standing around, but you couldn't see who was in the picture.

19   Q.   When, to your recollection, is the first time you saw the

20   photo the government used in its opening?

21   A.   I believe it was the week of trial.

22   Q.   I'm sorry?

23   A.   I believe it was the week of trial.

24   Q.   The week before trial?

25   A.   Yep.

1   Q.   And do you have an understanding sitting here today how it

2   was you hadn't seen that photo in your previous review of

3   discovery?

4   A.   I don't think I was able to open it.

5   Q.   I'm sorry.  You weren't able to open?

6   A.   That document.  Whatever -- wherever it was contained, I

7   think at the time I didn't have the ability to see it.  It

8   was -- this was in and around either right before the trial or

9   the week of trial I seen it.

10  Q.   Okay.  And did you come to have an understanding that the

11  photograph had been obtained from the forensic exam of

12  Dr. Baptiste's cell phone?

13  A.   Yes.

14  Q.   Would you agree that a defendant's cell phone in a case

15  can be a very important piece of evidence?

16  A.   Of course.  And my understanding, I thought I had

17  everything from his phone already.

18  Q.   Okay.  So, in other words, you thought that you had been

19  able to review the contents of the phone forensics, but in

20  fact, that turned out not to be the case?

21  A.   Yes.

22  Q.   So obviously, if you hadn't seen the picture until a week

23  or two before trial, fair to say you had not done any

24  investigation of what it depicts or how to handle it in your

25  prior preparations for trial?

1    A.    It would be fair to say that I would try -- my

2    recollection was I had a brief conversation with Dr. Baptiste

3    about the cash, and he explained to me -- I mean, he has a

4    clinic in Haiti, and so there was a payroll.  And it made sense

5    to me that if there's cash anywhere, it would probably be

6    related to the payroll, but I wasn't exactly precise how this

7    connected to Dr. Baptiste.  That was my thinking.

8    Q.    So just to be clear and break that down, you learn about

9    the photo a week or so before trial, yes?

10   A.    Yes.

11   Q.    And so you develop a theory that it could be shown to be

12   related to payroll of the dental clinic in Haiti, right?

13   A.    Correct.

14   Q.    Did you do any investigation, for example, talking to

15   witnesses, other than Dr. Baptiste, experts about Haitian

16   payroll, anything like that to, so to speak, put some meat on

17   the bones of that potential defense?

18   A.    No, I did not.  Not at that time because, like I said, we

19   were right at the cusp of trial.

20   Q.    I'm sorry?

21   A.    Not at the time because we were right at the opening of

22   trial.

23   Q.    Right before trial.

24         Now, you didn't ask for a continuance of the trial in

25   connection with learning about recordings, documents or

1  anything just before trial, did you?

2  A.    No, I did not.

3  Q.    And why is that?

4  A.    I'm not exactly sure other than we were moments from, you

5  know, a couple of days from opening the trial.

6  Q.    I want to talk a little bit about investigation of

7  potential witnesses.  You recall, do you not, that the

8  indictment here names with sort of pseudonyms various foreign

9  officials who were alleged to be the object of the bribery

10  conspiracy?  Do you remember that?

11  A.    Yes, I do.

12  Q.    Terminology like Official 1, A-1, Lawyer 1, things like

13  that?

14  A.    Correct.

15  Q.    Did you prior to trial identify who those people actually

16  were?

17  A.    Early on, yes.

18  Q.    Did you attempt to contact any of those individuals, in

19  other words, the public officials, to ask them about the

20  allegations of the case?

21  A.    Mr. Fick, I think the only way I at the time would have

22  been able to do something like that is I myself or find

23  somebody to go into Haiti and do that, and I did not.

24  Q.    Okay.  So, in other words, you did not travel to Haiti to

25  investigate or talk to witnesses?

```
 1   A.    No, I did not.
 2   Q.    You did not hire an investigator either in Haiti or to go
 3   to Haiti to do that, right?
 4             MS. RUBIN SMITH:  Objection.  The questions are
 5   leading.
 6             THE COURT:  Does it really matter?
 7             Sustained.
 8             MS. RUBIN SMITH:  I let it go for a while, but it
 9   was --
10   Q.    Did you -- did you yourself go to Haiti to do any
11   investigation?
12   A.    No, I did not.
13   Q.    Did you hire an investigator to go to Haiti to do any
14   investigation?
15   A.    No, I did not.
16   Q.    Why?
17   A.    I was not in a position to be able to go to Haiti or it
18   didn't dawn on me to find a way to solicit or obtain an
19   investigator to go to Haiti.  Counsel, Haiti is not simply --
20   you just don't go in however you want to go in.  That's my
21   understanding.  It's a dangerous country at times.  And my
22   thinking was not, okay, I have to go down to Haiti and go
23   figure this out.  Now it's Monday morning quarterbacking, did I
24   make a mistake?  I probably did.  But would I have been able
25   to?  I would not be able to.
```

1    Q.    Did you find out if there were private investigators in

2    Haiti that you could hire?

3    A.    No, I did not.

4    Q.    Did you make any efforts to see if there were

5    investigators in the U.S. who have dual citizenship or who

6    could otherwise go to Haiti?

7    A.    No, I did not.

8    Q.    I want to point you to another document here in the

9    binder, 941 to 943.  941 to 943, if you could just take a few

10    minutes and familiarize yourself, and let me know when to

11    proceed.

12    A.    (Witness reviews document.)

13    Q.    Did you have a chance to look at that?

14    A.    Yes.

15    Q.    So the top e-mail is an e-mail to someone named Eric

16    Walcott cc'ing Joseph Baptiste and Jason Hinton, attaching a

17    draft letter to the Prime Minister of Haiti which is on 943; do

18    you see that?

19    A.    Yes, sir.

20    Q.    Did you ever send that letter?

21    A.    No, I did not.  I drafted that letter -- October 22nd I

22    happened to be in New Orleans dealing with a personal matter in

23    court down there, and then I believe I had a conversation with

24    Mr. Walcott that I would provide him some information.  I was

25    contemplating on sending a letter to the Prime Minister through

 1   the embassy down there in DC, and I happened to be in New

 2   Orleans.  And he and I -- because I'm looking at the date now,

 3   I know exactly where I was.  We had a conversation that night.

 4   And I drafted the letter and I sent it to him to take a look at

 5   it, and I probably was under the -- I was.  I was under the

 6   impression that Mr. Walcott would find a way to have the

 7   date -- find a way to get the letter to the powers that be, but

 8   I don't believe I followed through.

 9   Q.   So to the best of your knowledge sitting here today, you

10   don't believe -- do you believe the letter was ever sent?

11   A.   I do not believe so.

12   Q.   And was there ever -- I mean, if we hypothetically assume

13   the letter might have been sent, was there ever a response to

14   the letter that you received?

15   A.   No.

16   Q.   Who is Eric Walcott?

17   A.   He's a gentleman that I met through this organization that

18   provides -- that assists Haitians that do foreign businesses

19   with -- from the United States to Haiti.  It's called Justice

20   Institute - Justice for All, and I got in contact with him.

21   Dr. Baptiste had referred him to me, and then I had attended a

22   meeting.  And this was -- their organization is designed to

23   assist people who engage in business in Haiti, and so I entered

24   the meeting.  And after discussions with him several times, he

25   would provide some funding to assist with Dr. Baptiste's legal

1    fund.

2    Q.    Okay.  And am I understanding correctly that you thought

3    that he could facilitate getting this letter to the Prime

4    Minister or something?

5    A.    He led me to believe that, yes.

6    Q.    Other than the exchange about this letter and some support

7    that Mr. Walcott may have provided for Dr. Baptiste's defense,

8    did Mr. Walcott have any role in the defense here?

9    A.    Not in my opinion, no.

10    Q.    Now, putting aside the purported targets of the bribery

11    conspiracy in the indictment, you're aware the indictment also

12    mentions unindicted co-conspirators, correct?

13    A.    Yes, sir.

14    Q.    Other than Dr. Baptiste's brother Alex, did you make any

15    efforts to communicate with any of the unindicted

16    co-conspirators?

17    A.    No, I did not.

18    Q.    Did you make any notes or memos of conversations you had

19    with Dr. Baptiste's brother?

20    A.    No, I did not.  I mean, put it like this:  To my

21    recollection today, did I remember?  I just spoke to him on the

22    phone maybe once or twice.  He's in Haiti.  It's not a place I

23    call every other day.

24    Q.    Did you contact or -- identify or contact any other

25    potential defense witnesses for a defense case?

1   A.   Other than, like I said, there was some discussion about

2   Mr. Walcott, but maybe there was one other individual that was

3   part of Mr. Walcott's organization, but I mean, not thoroughly,

4   no.

5   Q.   So -- okay.  So other than -- let me ask this:  What was

6   your thought about what Walcott could say as a potential

7   defense witness?

8   A.   He led me to believe that he had experience with

9   organizations that do business with Haiti, organizations here

10  in the United States that do business in Haiti and other --

11  like in Africa and other countries outside of the United

12  States.  And so --

13  Q.   So he -- that's what put him on your radar screen.  Did

14  you have follow-up discussions with him to sort of figure out

15  if he actually could offer admissible or helpful testimony?

16  A.   He sounded like he did.  I did have conversations with

17  him.

18  Q.   Why did you ultimately not call Mr. Walcott?

19  A.   He was unavailable.  Around the time that we were getting

20  ready to start trial, he supposedly went to Haiti -- I mean,

21  not to Haiti -- to Africa.

22  Q.   Okay.  So you --

23  A.   He led me to believe that he wasn't going to be available

24  to come testify.

25  Q.   Other than -- and I think you mentioned somebody else in

1    Mr. Walcott's organization?

2    A.    Yes.  I can't recall the name of the gentleman.

3    Q.    Was this somebody that you actually talked with

4    substantively about potentially being a witness?

5    A.    I attended a meeting in D.C. and there were a number of

6    individuals.  And Mr. Walcott pointed out this particular

7    person and said have a conversation with him, and I started to.

8    I believe he was a lawyer, not practicing or what have you, but

9    somebody that would have been able to provide some information

10   about Haiti and doing business in Haiti and tried to avoid the

11   conflicts of FCPA.

12   Q.    Okay.  But it didn't get to the point of being concrete

13   enough for him to be on a witness list or something?

14   A.    No, it did not.

15   Q.    Did you subpoena any witnesses?

16   A.    No, I did not.

17   Q.    Did you think about witnesses whom you might subpoena for

18   useful testimony?

19   A.    Like I said, after talking -- my conversation with

20   Mr. Walcott, he was considered an individual, I believe.  And

21   Dr. Baptiste had given me another name and I believe gave me a

22   telephone number, and I might have made one phone call.  This

23   was back sometime in 2018, and I did not make it through to him

24   so I just didn't follow up.

25   Q.    Did you make any efforts independently to identify, quite

1    apart from what Mr. Baptiste might suggest, any persons who

2    could provide expertise on doing business in Haiti, Haitian

3    law, any subject?

4    A.    No, I did not.

5    Q.    Did you subpoena any documents for Mr. Baptiste's

6    defense -- Dr. Baptiste's defense?

7    A.    No, I did not.

8    Q.    For example, did you make any efforts to obtain any

9    documentation by subpoena or otherwise concerning the bank

10   account that NOAH opened that was at issue in the case?

11   A.    With respect to that, I believe the attempt that I made

12   was to obtain documentation from Dr. Baptiste's brother Alex

13   regarding the NOAH account, but that wasn't very successful.

14   Q.    Did you make any other efforts to obtain documents from

15   any other banks involved?

16   A.    No, I did not.  I say this because I thought in having

17   Dr. Baptiste's bank records, that's really what I thought I

18   needed.

19   Q.    I'm sorry.  Having Dr. Baptiste's records is what you

20   needed?

21   A.    The Citibank records is what I thought, to the extent of

22   what I needed, whatever we were going to try to deal with, deal

23   with that.

24   Q.    Okay.  And so are you saying because you had those in the

25   discovery, you thought that was enough?

1  A.   Yes.

2  Q.   You did understand, didn't you, that during the trial an

3  issue was made of a NOAH bank account?

4  A.   Yes.  And I just mistakenly believed that that was all

5  part of the bank records that I had because I didn't think

6  Dr. Baptiste had anything beyond that.

7  Q.   Well, presumably the government, right, named a bank?

8  Right?

9  A.   It was Citibank.

10 Q.   And you -- were you aware that in the discovery -- well,

11 I'll just leave it at that.

12        Now, beyond talking with Dr. Baptiste himself, did

13 you conduct any investigation or try to line up witnesses to

14 put in evidence about, for example, his dental practice in

15 Haiti?

16 A.   I was thinking that would require getting witnesses from

17 Haiti here, and, no, I did not.

18 Q.   Did you make efforts to -- well, witnesses.  What about

19 documents?

20 A.   No, I did not.

21 Q.   But did you make any efforts to identify witnesses or

22 obtain documents concerning Dr. Baptiste's charitable work in

23 Haiti?

24 A.   I had a Redwell, you know, the folders.  I had a Redwell

25 full of photos that I had received early on back in 2017

1   related to the work that Dr. Baptiste was doing in Haiti.

2   Q.   Did you make any plans about how you might get those

3   photos into evidence without calling your client?

4   A.   I wasn't sure -- no, I did not.

5   Q.   Did you identify any witnesses or obtain any documents

6   about NOAH and its work in Haiti and the U.S.?

7   A.   I only thought it would have been -- it would have been

8   through Dr. Baptiste, and I didn't go that route.

9   Q.   So, again, you did not obtain or identify potential

10  third-party witnesses or documents --

11  A.   It would have been Mr. Walcott.

12  Q.   After Mr. Walcott turned out to be unavailable, did you

13  identify anybody else who could do that?

14  A.   I believe it was too late.

15  Q.   When did you become aware that Mr. Walcott would be

16  unavailable?

17  A.   About the week before trial.

18  Q.   Did you seek a continuance on that basis?

19  A.   I did not.

20  Q.   Did you actually identify Mr. Walcott as a witness in any

21  witness list?

22  A.   Not before trial, no.

23  Q.   Why not?

24  A.   Because I'm thinking that I'm providing the witness list

25  the week of as, you know, in response to what the government is

1    doing, and Mr. Walcott became unavailable to me, so -- he was

2    going to be key to what we would have presented as this case.

3    Q.    Other than the communications that we saw about

4    difficulties opening the electronic media, did you request any

5    discovery from the government?

6    A.    Not that I have already received and what I discussed with

7    them.  I thought I had everything.  I thought I was

8    given -- they gave me.  I was just thinking that they were

9    giving me everything.

10   Q.    Now, have you ever practiced law in Haiti?

11   A.    No, I have not.

12   Q.    Have you ever studied Haitian law?

13   A.    No, I have not.  No, I have not.

14   Q.    Have you ever run a business in Haiti?

15   A.    No, I have not.

16   Q.    Have you ever set up and run a nonprofit in Haiti?

17   A.    Nope.

18   Q.    Have you ever made a political contribution to Haiti?

19   A.    No.

20   Q.    Ever advised anyone as a lawyer outside this case about

21   making political contributions to Haiti?

22   A.    No.

23   Q.    So before the trial, did you consult with anybody who

24   would be an expert or could have been an expert on Haitian law?

25   A.    I had conversations with individuals, but I don't believe

1    that they qualified as an expert.

2    Q.    So you say conversations with individuals.  Who?

3    A.    People who heard about the case who approached me in the

4    Haitian community.

5    Q.    So beyond unsolicited approaches to you, did you make

6    efforts to identify an expert in Haitian law who you might be

7    able to consult with or call at trial?

8    A.    No, I did not.

9    Q.    Did you identify or consult with anyone who could be an

10   expert in say business practices in Haiti?

11   A.    And, again, I go back to Mr. Walcott.  He was probably the

12   closest person I thought would have been knowledgeable in that

13   regard.

14   Q.    But once he was unavailable, you didn't have a backup or

15   somewhere else to go?

16   A.    I did not.

17   Q.    Did you consult with anyone who could be qualified as an

18   expert on Haitian political practices or campaign contributions?

19   A.    I did not.

20   Q.    So do you recall in your closing argument arguing that

21   making political contributions to candidates in Haiti for name

22   recognition or access, that that would be appropriate and

23   legitimate?

24   A.    I'm sorry.  Could you ask the question one more time?

25   Q.    In your closing arguments, do you recall making an

1    argument to the effect that making political contributions in

2    Haiti to get name recognition and access as long as there is no

3    quid quo pro would be proper?

4    A.    I vaguely remember saying that.

5    Q.    Did you elicit any evidence at trial to support that

6    statement in your closing?

7    A.    I do not recall.

8    Q.    Certainly you hadn't called an expert to talk about

9    political contributions in Haiti, right?

10   A.    No, I did not.

11   Q.    Do you recall arguing in closing that the government of

12   Haiti had no role or control over private development projects?

13   A.    Yes.

14   Q.    Had you elicited any evidence during the trial to support

15   that proposition?

16   A.    Not during the trial, no.

17   Q.    At any point?

18   A.    I go back to Mr. Walcott.

19   Q.    So you had a good-faith basis to make the argument based

20   on what you learned from Mr. Walcott, but there was no evidence

21   in the trial; is that fair?

22   A.    And part of in talking to Mr. Hinton, who had some

23   familiarity with the landscape in Haiti, and he sort of

24   educated me on some of these things.

25   Q.    But Mr. Hinton wasn't an expert witness, right?

```
 1   A.    No, he is not.

 2   Q.    And -- okay.  Do you recall arguing in your closing that

 3   the letter of support from the Prime Minister didn't confer any

 4   legal or business benefit in Haiti?

 5   A.    That's my understanding.

 6   Q.    But was there any evidence that you elicited at trial to

 7   support that understanding?

 8   A.    Not that I recall, no.

 9   Q.    Going back to the picture of the money on the table.

10   A.    Sure.

11   Q.    Talking about what the government used in its opening now,

12   had you -- did you consult with any experts in Haitian

13   employment law about payment of cash bonuses or how that works?

14   A.    No.  I didn't have any experts here to testify to that.

15   Again, I had an understanding.

16   Q.    So in closing when you argued that it was a reasonable

17   interpretation to believe those were Christmas bonuses, there

18   was no evidence -- was there any evidence in the record to

19   support that?

20   A.    No evidence in the record to support that, but that was my

21   understanding.

22   Q.    Did you try to identify any witnesses of the dental clinic

23   who might be able to testify about what that money was for?

24   A.    No.  I was not familiar how to get a Haitian resident into

25   the United States for the purpose of doing this trial.  I did
```

1    not know.

2    Q.    I'm sorry.  I didn't catch that.

3    A.    I didn't have an understanding as to how to get a Haitian

4    resident here into the United States for purposes of doing this

5    trial.  That was my --

6    Q.    Did you seek advice from anybody about how one could get a

7    foreign witness here for trial?

8    A.    No, I did not.

9    Q.    Did you make any inquiries about whether it might be

10   possible to do video testimony from Haiti for the trial?

11   A.    No, I did not.

12   Q.    Now, do you recall arguing in your closing that the

13   government was unfairly saying that political risk is a code

14   word for bribe?

15   A.    Yes.

16   Q.    And do you recall there being a lot of testimony from the

17   government agents about code supposedly in the various recorded

18   conversations?

19   A.    From what the agent said, it was elicited during trial,

20   that was my understanding.

21   Q.    Did you object to any of that testimony?

22   A.    No, I did not.

23   Q.    Is there a reason why?

24   A.    During that part of the trial, and Mr. Dwyer might not be

25   aware of that, but I was sort of leaning on his objections

1    because he was doing a really good job of making holes in the

2    Government's case.

3    Q.    Did Mr. Dwyer object to the code language?

4    A.    I don't recall, but sort of that was my leaning.

5    Q.    So are you saying that if Mr. Dwyer didn't object, you

6    decided not to object?

7    A.    It wasn't that.  I was trying to gauge the atmosphere of

8    the room, and when I say that, I didn't want to do something to

9    hurt Dr. Baptiste.

10   Q.    Well, did you have an understanding about the potential

11   impact of this code word testimony on the defense?

12   A.    Again, Mr. Dwyer was doing, in my opinion -- I'm not sure

13   what the jurors were thinking, but in my opinion he was doing a

14   good job of putting holes in the Government's case, so I didn't

15   want to fumble through it and make matters worse.

16   Q.    So my question was a little different.  It was did you

17   have an understanding of the impact the code testimony could

18   have on the defense?

19   A.    Again, no.

20   Q.    Did you elicit any evidence at trial to counter the

21   government agent's assertion of what the, quote-unquote, code

22   meant?

23   A.    I don't recall.  I really don't believe -- I'm not

24   remembering when I objected or if I objected to those.

25   Q.    And when you talked just now about sort of -- I think the

1    word you used is leaning on Mr. Dwyer, did you have an

2    understanding of whether his defense of Mr. Boncy was either

3    consistent with or antagonistic with the defense you were

4    trying to put on?

5    A.    During the course of the trial, I believe, if I'm not

6    mistaken, I believe that there were certain hallway

7    conversations that I had with Mr. Dwyer that I guess definitely

8    intimated that we were operating in two different atmospheres.

9    Q.    What do you mean by operating in two different

10   atmospheres?

11   A.    Mr. Dwyer had his defense, and I had -- he had his theory

12   of the defense, and I had my theory.

13   Q.    So if you recognized that Mr. Dwyer had a different

14   theory, why were you deferring to him on objections or anything

15   else?

16   A.    It really wasn't that I was deferring.  It was -- I was

17   just not -- I was trying not to step on anybody's toes.

18   Q.    How would challenging the code testimony have stepped on

19   anybody's toes or hurt Mr. Boncy?

20   A.    My recollection is I thought Mr. Dwyer was handling that

21   well.

22   Q.    Now, at any point when you developed this understanding

23   about you and Mr. Dwyer operating in different atmospheres, did

24   you consider asking for a severance?

25   A.    No, I did not.

1  Q.    Why?

2  A.    Not -- it wasn't clear in my own sort of thinking as to

3  whether or not if I had asked the court for that, A, would it

4  have been granted and during the course of the trial, at that

5  particular juncture, I don't see how, in my own thinking, I

6  don't see how it would have even been allowed.  I don't know

7  exactly what I would have argued at the time.  I don't

8  remember.

9  Q.    I mean, putting aside the question of whether you think it

10 would have been allowed, do you think a severance would have

11 been a good idea?

12 A.    I'm not sure.  I didn't want to hurt Dr. Baptiste any

13 further and go that route if it was jeopardized -- it would

14 have jeopardized him even further because, in my opinion,

15 Mr. Dwyer seemed to be handling the evidence very well.

16 Q.    What do you mean by wanting to avoid hurting Dr. Baptiste

17 any further?  Are you suggesting that something that happened

18 had already hurt Dr. Baptiste?

19 A.    No.  It was just the direction in which I felt the

20 atmosphere of the trial was going.  I didn't want to hang him

21 out on a limb, so to speak.

22 Q.    I want to talk a little bit about the jury instructions.

23 I would like to mark as Exhibit 2 the document which the

24 government previously attached to a pleading, but I'll -- it's

25 Document 243-3 on the docket.

1              (Defendant Exhibit 2 received in evidence.)

2   Q.   Mr. LaRoche, I ask you to look at what's been marked as

3   Exhibit 2.

4              MR. FICK:  Am I imagining it or is there a weird

5   humming noise?

6   Q.   So, Mr. LaRoche, Exhibit 2, is it fair to say this is an

7   e-mail from you to the clerk enclosing a proposed jury

8   instruction?

9   A.   Yes, sir.

10  Q.   And is it -- were these jury instructions just pattern

11  jury instructions?

12  A.   Yes, sir.

13  Q.   Did you propose any modifications to the pattern jury

14  instructions?

15  A.   No, I did not.

16  Q.   Did you, either here or anywhere else, propose a jury

17  instruction to the effect that someone cannot be convicted for

18  conspiring with a government agent?

19  A.   Can you ask the question one more time, please.

20  Q.   Did you ever request a jury instruction to the effect that

21  a person cannot be convicted of conspiracy for conspiring

22  solely with a government agent?

23  A.   I thought of that, but I did not provide that or include

24  that with this.  I think looking at the time that I put this

25  together, I was trying to hurry up and provide something, and I

1    was thinking that but I didn't follow through my thinking.

2    Q.   So, I'm sorry.  The idea occurred to you, but you didn't

3    make the request; is that right?

4    A.   I don't see it here, no.

5    Q.   Do you recall making that request at any other time?

6    A.   Not that I can recall.

7    Q.   Is there a reason why you would have chosen not to make

8    that request?

9    A.   I'm not exactly sure.  I saw the pattern jury

10   instructions.  I put them together, and then I don't exactly

11   recall why I didn't do that.

12   Q.   I'm sorry?

13   A.   I don't have -- exactly sure why I did not include that.

14   Q.   Sitting here today, you can't think of a reason why that

15   instruction would hurt Mr. Baptiste, can you?

16   A.   No.

17   Q.   I'm sorry, Mr. LaRoche, one more jury instruction

18   question.  Did you ever request an instruction concerning a

19   requirement that the government approve official acts in

20   connection with the bribery conspiracy?

21   A.   I do not recall that.

22   Q.   I'm sorry.  You don't recall?

23   A.   No.

24   Q.   So sitting here right now, how would you describe what

25   your defense strategy or theory was going into the trial?

1    A.   My opening had a series of issues that I wanted to
2    address, and during the course of the trial I guess I had to
3    rethink it and --
4    Q.   Let's just -- try to describe as best you can what your
5    opening strategy was as you went into the trial -- not the
6    opening statement strategy, just your strategy as you began the
7    trial.
8    A.   That Mr. Baptiste -- I was operating under this theory
9    from I guess the onset that Mr. Baptiste was led to believe one
10   thing by the undercover agents, and he worked off of that
11   premise for that time being that they were investigating him.
12   And ultimately the situation and the encounter in Miami changed
13   his thinking once the FBI revealed themselves to him as not
14   being who he thought they were, and I was operating under that
15   premise in terms of going the route of perhaps -- not even
16   perhaps.  Going the route of laying sort of the blame on the
17   FBI because I believed all along that, based on my
18   conversations with Dr. Baptiste and looking at the videos and
19   what have you, that I put myself in Dr. Baptiste's position,
20   and I said, you know, I could have fallen for that same sort of
21   gimmick, that not realizing that these guys were not who they
22   say they were.

23            So I operated under the stance that the FBI had one
24   presentation to Dr. Baptiste, he had one understanding of it,
25   and given the climate that Haiti is the way that it is, he was

1    trying to invest in Haiti with these individuals that turned

2    out to be not investors.

3    Q.    Was it your view that Dr. Baptiste couldn't be convicted

4    because he didn't use the phrase "pay to play" himself?

5    A.    That was one of my initial arguments.  Even in listening

6    to the first recording, when I heard the phrase "pay to play,"

7    I indicated to the government that that was not Dr. Baptiste.

8    He didn't mention pay to play.

9    Q.    So it was your belief that if it wasn't he that pronounced

10    the words --

11    A.    He didn't understand it.  The way I followed the

12    conversations that I heard in that first interview and then

13    subsequently, I don't -- I stood on the premise that

14    Dr. Baptiste did not understand what they were saying to him

15    and that his replies didn't line up with the statements that

16    they were making.  It was like two different conversations

17    going on.

18    Q.    Was it your view that the agents had manufactured the

19    scheme and lured Dr. Baptiste into it?

20    A.    I said that in my opening.

21    Q.    So that sounds like an entrapment defense?

22    A.    Yes, that was my initial thinking.

23    Q.    I mean, had you done any research about what the legal

24    elements in the crime of an entrapment defense are?

25    A.    I did, and I don't remember exactly how many people told

1   me this, but I was led to believe that I didn't have the

2   elements to establish that defense for Dr. Baptiste.

3   Q.   So when did you come to the understanding that you didn't

4   have the elements for an entrapment defense?

5   A.   During the course of the two years that I was on this

6   case.  I was missing certain things.

7   Q.   But you nevertheless opened on it?

8   A.   I didn't open on entrapment, but I opened on pointing out

9   the fact that I thought that there was two different

10  conversations.

11  Q.   Do you recall a sidebar toward the end of the trial where

12  Attorney Dwyer asked the judge to conduct a colloquy on

13  effectiveness of counsel?

14  A.   There were a lot of sidebars.  I don't recall

15  specifically.  I mean, he might have done it, and I think he

16  did.  I'm not sure.

17  Q.   Let me -- I put up on the screen Page 153 of the

18  transcript of Day 7 of the trial.  Take a few minutes or take

19  as long as you need to read what I have put up on the screen.

20  A.   (Witness reviews document.)

21  Q.   So does this refresh your memory about whether there was a

22  request by Mr. Dwyer at sidebar to do a colloquy on the

23  effectiveness of counsel?

24  A.   Yes.

25  Q.   And was -- were the defendants themselves at these

1    sidebars or this sidebar?

2    A.    I don't recall.

3    Q.    I'm sorry?

4    A.    I don't recall.  I don't think so.

5    Q.    Did you tell Dr. Baptiste about this sidebar and this

6    specific request after it happened?

7    A.    No, probably not.

8    Q.    Do you recall telling Dr. Baptiste that he should say yes

9    if asked whether he was satisfied with counsel?

10   A.    I don't recall telling him yes, but I thought he said -- I

11   think he did say yes, but I don't recall.

12               MR. FICK:  May I have one moment, Your Honor?

13               THE COURT:  Sure.

14               (Pause.)

15               (Attorneys confer.)

16               MR. FICK:  I have nothing further.

17               THE COURT:  Cross?

18               MS. RUBIN SMITH:  Your Honor, may we have like a

19   five-minute break?

20               THE COURT:  Yes.  I'm thinking -- I need to give the

21   court reporter a break eventually, also, and I have to do an

22   attorney -- what's it called, Karen?

23               THE CLERK:  Attorney admissions --

24               THE COURT:  Attorney admissions ceremony, yes, at

25   2:00.  So I was going to stop at 1:00 for like an hour and 15

```
 1    minutes.  If you want to take a ten-minute break now so we can
 2    give the court reporter a break, and then we could go to like
 3    1:15 or something like that and we can all break.
 4              MS. RUBIN SMITH:  That would be great.
 5              THE COURT:  How is that, Linda?
 6              THE COURT REPORTER:  Yes.
 7              THE COURT:  All right.  Quarter of.
 8              (Recess taken from 12:35 to 12:45 p.m.)
 9              THE COURT:  Go ahead when you're ready.
10              MS. RUBIN SMITH:  Thank you, Your Honor.
11              THE COURT:  So before you start, I just talked to the
12    court reporter.  We are going to try to go to 1:30, and then
13    we'll take a 45-minute break.  Okay?
14              MR. BASIL:  Your Honor, before we go -- if we are
15    going to go to 1:30, I think you just said, and then we have a
16    45-minute break, the chance that we get to Mr. Benowitz today
17    is very low, do you agree, and can we let him go for today
18    because Mr. Hinton would still testify on their case before we
19    would call Benowitz?
20              THE COURT:  I don't know how long it's going to take.
21              MR. BASIL:  How long is the direct of Mr. Hinton?
22              MR. MARX:  I'd say maybe 45 minutes, Your Honor.
23              THE COURT:  How long do you have on cross with him?
24              MS. RUBIN SMITH:  I would say anywhere up to an hour.
25              THE COURT:  So that's like, say, 2:30.  That gets us
```

1    to 3:15.  So I don't think we'll get past that witness.

2         MR. BASIL:  So we'll let him go?

3         THE COURT:  Okay.  I would like to stop the day at

4    3:30.  I have a couple of other things I need to do.

5         MR. DWYER:  Your Honor, is it the Court's intention to

6    go tomorrow or will you put it off?

7         THE COURT:  I'm open to suggestions.  I have a -- I

8    could -- I have matters scheduled tomorrow at 9:15, 10:00,

9    10:30 and 10:45 and 11:15, and then I have to do a

10   nationalization at the Kennedy Library at 1:00, and then I have

11   to be a panelist at the BBA white collar crime conference by

12   4:00.  So I could do a few hours in the afternoon.

13        (The Court and Clerk confer.)

14        THE COURT:  Karen just told me one of the things just

15   canceled, so I can give you a few hours tomorrow.

16        MS. RUBIN SMITH:  Your Honor, it would be the

17   government's position that we would resume and have a full day

18   and not tomorrow but when everyone can meet for a full day.  We

19   would like to have a chance to subpoena Ms. Hinton and have her

20   testify.  And I haven't spoken to Mr. Basil and his schedule

21   for tomorrow.

22        THE COURT:  Is Mr. Hinton already here?

23        MR. MARX:  Yes, Your Honor.

24        THE COURT:  Can he stay overnight?

25        MR. MARX:  He has a flight back tonight, Your Honor.

1     I believe he has to be at work tomorrow.

2          THE COURT:  He's going to miss another day of work one

3     way or another, so discuss it with him at the lunch break and

4     see what you want to do.  I can probably give you three or four

5     hours tomorrow.  But figure it out at lunch.  I'm flexible.

6          MR. MARX:  But the plan would be to start today, Your

7     Honor; is that correct?

8          THE COURT:  What?

9          MR. MARX:  It would be to start with Mr. Hinton?

10         THE COURT:  We are going to go as far as we can.  I

11    would like to stop at 3:30, but let's see how far we get.

12                     CROSS EXAMINATION

13    BY MS. RUBIN SMITH:

14    Q.   Good afternoon, Mr. LaRoche.

15    A.   Good afternoon.

16    Q.   You were admitted to the Massachusetts bar in 2003,

17    correct?

18    A.   Yes.

19    Q.   And you were admitted to the Maryland bar in 2005?

20    A.   Yes.

21    Q.   You have never been subject to any disciplinary actions in

22    either state, correct?

23    A.   No.

24    Q.   You have been a solo practitioner since 2012?

25    A.   Yes.

```
 1   Q.   You handle criminal cases?

 2   A.   Yes.

 3   Q.   You've never had a finding of ineffective assistance of

 4   counsel against you, have you?

 5   A.   No.

 6   Q.   You have never had a claim of ineffective assistance made

 7   against you, correct?

 8   A.   (No verbal response.)

 9   Q.   You previously served as a state prosecutor in

10   Massachusetts for four years?

11   A.   Yes.

12   Q.   As a state prosecutor, would you say that you've tried at

13   least 20 criminal cases?

14   A.   Yes.

15   Q.   You've also previously served as a courtroom deputy in

16   Federal Court here in Massachusetts, correct?

17   A.   Yes.

18   Q.   Now, you testified that Mr. Hinton introduced you to

19   Mr. Baptiste in the summer of 2017, correct?

20   A.   Correct.

21   Q.   Between the summer of 2017 and this trial in the summer of

22   2019, you met Baptiste in person every few months, correct?

23   A.   Correct.

24   Q.   Would you say that you have met him in person at least a

25   total of ten times?
```

1    A.    Yes.

2    Q.    And sometimes those meetings lasted for hours?

3    A.    Yes.

4    Q.    You met him at his office in Maryland, correct?

5    A.    Correct.

6    Q.    You also met him at his house?

7    A.    Correct.

8    Q.    You talked to him by phone?

9    A.    Yes.

10    Q.    Mr. Hinton was present during some of these discussions,

11    correct?

12    A.    Some, yes.

13    Q.    But he was not present during a lot of them?

14    A.    Correct.

15    Q.    You communicated with Mr. Baptiste by e-mail as well,

16    correct?

17    A.    Yes.

18    Q.    And you testified that you speak Haitian Creole?

19    A.    I do.

20    Q.    Do you speak it fluently?

21    A.    I do.

22    Q.    You spoke with Mr. Baptiste in Haitian Creole?

23    A.    Yes.

24    Q.    Does Mr. Jason Hinton speak Haitian Creole?

25    A.    No, he does not.

1    Q.   Over two years you developed a friendship with

2    Mr. Baptiste, correct?

3    A.   Yes.

4    Q.   You came to Mr. Baptiste's house for dinner?

5    A.   Yes.

6    Q.   You met his family?

7    A.   Yes.

8    Q.   You brought your children to Mr. Baptiste's house for

9    dinner?

10   A.   Correct.

11   Q.   Now, you discussed the evidence in this case with

12   Mr. Hinton, correct?

13   A.   Correct.

14   Q.   And you discussed the evidence in this case with

15   Mrs. Arielle Hinton, correct?

16   A.   For the purposes of the week that we were here, yes.

17   Q.   Well, we'll go through some e-mail communications in

18   Exhibit 1, but do you recall exchanging e-mails with

19   Mrs. Arielle Hinton related to this case?

20   A.   Yes.

21   Q.   Now, you were aware that Mr. Baptiste was represented by

22   another attorney prior to your representation, correct?

23   A.   Correct.

24   Q.   Attorney David Benowitz?

25   A.   Yes.

1  Q.   You're aware that Mr. Baptiste signed a statement of facts

2  in this case when he was represented by Mr. Benowitz?

3  A.   I am.

4  Q.   You are aware that Mr. Baptiste was planning on pleading

5  guilty in this case?

6  A.   Yes, that was my understanding.

7  Q.   You were aware that Mr. Baptiste attempted to cooperate

8  against other individuals in this case?

9  A.   Yes.

10  Q.   Okay.  You talked to Mr. Baptiste about the statement of

11  facts that he signed, correct?

12  A.   Yes, I did.

13  Q.   You spoke with Mr. Benowitz, correct?

14  A.   Yes.

15  Q.   You wrote Mr. Benowitz a letter asking for his case file?

16  A.   Yes, I did.

17  Q.   And you received materials from Mr. Benowitz?

18  A.   Yes.

19  Q.   You handed those materials over to Mr. Baptiste's new

20  attorneys, correct?

21  A.   I believe so, yes.  If -- I'm not sure, but I gave

22  everything I had.

23  Q.   Okay.  As part of those materials, you received

24  Mr. Benowitz's notes from a reverse proffer with the government

25  dated May 2nd, 2016?

1    A.    I'm not 100 percent sure about the reverse -- you know,

2    the notes, but I thought I handed over everything that I had.

3    Q.    I'm going to show you what's been marked as BAP 566.

4    A.    Is it in this notebook?

5    Q.    It's not.

6    A.    Okay.  You are going to show me.

7         MS. RUBIN SMITH:  So this will be marked Government

8    Exhibit 3.  It's BAP 00566.

9         (Government Exhibit 3 received in evidence.)

10   Q.    Mr. LaRoche, directing your attention to this document at

11   Bates 580.  And Mr. Basil will give you a copy in just one

12   second.

13   A.    Thank you.

14   Q.    The first page, this is dated 5/2/16, reverse proffer,

15   J. Baptiste.  Now, this was in your file, correct?

16   A.    Yes.

17   Q.    And it was before you were retained in this case, correct?

18   A.    Yes.

19   Q.    If you take a look at Bates 580, and I have circled it

20   here.  It should be on the screen in front of you as well.

21   A.    Okay.

22   Q.    Can you make out what those notes say?  Do you see

23   "Christmas presents" in quotes?

24   A.    Yes, I see.  I guess that's what that says; is that what

25   you are saying?

1   Q.    Do you agree with me that's what it says, "Christmas

2   presents"?

3   A.    Yes.

4   Q.    And before that, "Defendant had photo of cash or pic of

5   cash"?

6   A.    Okay.

7   Q.    Now, did you talk to Mr. Benowitz when you were retained?

8   A.    I did.

9   Q.    What did Mr. Benowitz tell you?

10  A.    To the best of my recollection, the conversation that I

11  had with Attorney Benowitz occurred -- it was some point where

12  I was actually in Brooklyn, and he was, I think, calling me

13  back.  So I called and left a message for him, and he was

14  calling me back.  I answered the phone because I saw it was a

15  202 number and figured it was him.  So we spoke very briefly,

16  and my recollection is -- I could hardly hear anything really

17  what he was saying because at the time I was in Brooklyn over

18  in the Bushwick area on Broadway.

19           So I was underneath the elevated trains, and the

20  train happened to be going over my head, I remember, because I

21  was getting frustrated talking to him.  I couldn't really hear

22  him.  And the gist of my conversation was -- I explained to him

23  that I was in a conversation with Dr. Baptiste and that I --

24  specifically I remember just asking him the one question

25  regarding whether or not Dr. Baptiste had an occasion to hear

1    the same recording that he explained to me that he had heard

2    from the government, and I was led to believe that Dr. Baptiste

3    was not present when he heard that recording.  So Dr. Baptiste

4    had not made it to the meeting yet.

5    Q.    Did Mr. Benowitz talk to you about the signed statement of

6    facts?

7    A.    Not that I recall, not that I recall.  Because, again,

8    like I said, I remember going at it with -- my understanding

9    was that Dr. Baptiste was not admitting to anything, and so I

10   think, if memory serves me correctly, I think I was questioning

11   or challenging Attorney Benowitz about whether or not he had an

12   opportunity to listen to the tape with Dr. Baptiste present

13   because I said my understanding from researching in this case

14   is that Dr. Baptiste had not had occasion to listen to the same

15   recording that Mr. Benowitz had listened to, and Dr. Baptiste

16   was not prepared to admit to anything because he doesn't

17   believe that that was his voice that said that, and I was

18   operating under that same theory.

19   Q.    So what did Mr. Benowitz tell you about the recording that

20   he heard?

21   A.    He said he had a meeting with the government.  They played

22   a recording, and based off of that, he was going to go -- he

23   told Dr. Baptiste he was going to go forward because he thought

24   that that was his voice, and that's when I challenged him.  I

25   actually said to him that how can you say that that guy, the

1    agent, sounded like -- I said how can you say that sounded like

2    Dr. Baptiste.  Dr. Baptiste has sort of a Haitian or whatever

3    you would describe as a Haitian accent.  The voice that I heard

4    did not have a Haitian accent.  It sounded like another

5    nationality accent.  I said that wasn't Dr. Baptiste's voice,

6    and that's what I stood on.

7    Q.   So Mr. Benowitz told you that based on the recording that

8    he listened to at the U.S. Attorney's Office, he was advising

9    Mr. Baptiste to plead guilty?

10         MR. FICK:  Objection.

11         THE COURT:  Basis?

12         MR. FICK:  I think that's a misstatement of what

13   Mr. LaRoche testified to.

14         THE COURT:  He can answer the question.  Let's sort it

15   out.

16   A.   Repeat that one more time.  Sorry.

17   Q.   So Mr. Benowitz told you that he listened to a recording

18   of Dr. Baptiste at the U.S. Attorney's Office?

19   A.   Right.  And I challenged that with him on the phone.

20   Q.   Mr. Benowitz also told you that based on his review of

21   evidence at the U.S. Attorney's Office, he had advised

22   Mr. Baptiste to plead guilty?

23   A.   I believe that's what he said, and I think that's when I

24   asked do you have -- I actually put it in sort of like a

25   hypothetical.  I said do you have your clients plead guilty

1    when they tell you that's not -- that that wasn't them, and I

2    think he took -- he was taken a little aback about that, and

3    that's when the train started coming over and I couldn't hear

4    anything else he said, really.

5    Q.    And Mr. Baptiste took Mr. Benowitz's advice and signed a

6    statement of facts stating his conduct in this case?

7    A.    I seen a document that showed that Dr. Baptiste signed,

8    and I seen another document that showed that Mr. Benowitz had

9    signed.

10   Q.    And Mr. Baptiste signed a plea agreement in connection

11   with this case?

12   A.    I believe that's what happened, yeah.

13                (Government Exhibit 4 received in evidence.)

14   Q.    Now, showing you what's been marked as Exhibit 4, and this

15   is also from the documents that you provided to Mr. Baptiste's

16   new attorneys, Bates 491.  And I'll just hand you a copy.

17   A.    Is that in this notebook?

18   Q.    It's a different document.

19   A.    Okay.

20   Q.    Mr. LaRoche, you did not type this document, correct?

21   A.    No.

22   Q.    And the handwritten notes that you see on the first page

23   and throughout the document, those are not your notes, correct?

24   A.    No, that's not my handwriting.

25   Q.    And this was in the file that you received from

1    Mr. Benowitz?

2    A.    I believe so.

3    Q.    Now, if you look at where I'm pointing here, where it says

4    under "October 2015," "Mr. Rossi got back to me to let me know

5    that SEW is interested about investing."  Mr. Rossi, that's a

6    reference to Undercover 1 in the trial, correct?

7    A.    Yes.

8    Q.    And "me," that's a reference to Joseph Baptiste, correct?

9    A.    I guess -- yes.  Excuse me.  Right.

10    Q.    For example, there was another reference below on that

11    same page:  "I let him know that Haiti had big investments done

12    most recently, Digicel and E-Power."  That's a reference to

13    Mr. Baptiste, the "I"?

14    A.    Yes.

15    Q.    Now, directing you to Bates 491 of this document,

16    "Mr. Anderson and I had a private meeting upon which he asked

17    me how much it will cost to get the letter.  I told him a

18    $50,000 donation to NOAH will cover the expenses."  That's the

19    same $50,000 that FBI wired to Mr. Baptiste's Citibank account,

20    correct?

21    A.    I guess, yes.  That's what was said at trial.

22    Q.    Now, if you look at Bates 495, this is under December 6th,

23    2015, "Send pictures of cash that NOAH will distribute for

24    donation for Christmas."  These are the same --

25    A.    Where are you?

1    Q.   I'm sorry.  I just moved it up.  Under December 6th, 2015,

2    we're on Bates 495, second-to-last bullet point, "Send pictures

3    of cash that NOAH will distribute for donation for Christmas to

4    charities, $10,000."

5    A.   Okay.

6    Q.   That's a reference to the cash, the photo of cash that

7    Baptiste sent to Undercover 2, to Peter, correct?

8    A.   I'm not sure of that.

9    Q.   Did you and Mr. Baptiste talk about the photographs of the

10   cash that were sent to the undercover?

11   A.   When I finally was able to figure out -- what I thought I

12   figured out, I mentioned the cash to Dr. Baptiste during the

13   trial.

14   Q.   What did he say about what the cash was for?

15        MR. FICK:  Objection.  I don't want to belabor the

16   point.  I'm not sure that that's within the scope of the

17   implied waiver, and if he has to answer, I guess we're willing

18   to do that but....

19        THE COURT:  I am going to let her have that one.  Go

20   ahead and answer.

21   A.   Okay.  Could you just ask --

22   Q.   Sure.  What did Mr. Baptiste say the cash was to be used

23   for in the photographs that he sent to the undercover agent?

24   A.   Just bear with me a second.  My understanding was that not

25   knowing they were FBI agents -- I am trying to remember how

1   this operated.

2   Q.   Did Mr. Baptiste tell you that the cash was for employees

3   in the dental clinic in Haiti?

4   A.   Yeah.  At the end of the year he always gave -- what do

5   they call those?  I'm sorry.  He always gave bonuses at the end

6   of the year, Christmas bonuses.

7   Q.   Okay.  Did Mr. Baptiste tell you that the cash was for

8   NOAH donations in Haiti?

9   A.   I don't recall.  There was discussion -- he and I had a

10  discussion about how every year at the end of the year the

11  employees at the clinic, he would give them bonuses.  And I'm

12  not sure if the picture of these bonuses was featured there.  I

13  don't recall exactly.  It's just a lot going on that week,

14  and -- I'm lost for words.  I'm not sure how that -- I know he

15  and I talked about it, and I asked him.  He said that he gives

16  bonuses to the employees every year.  I mean, it's a poor

17  country.  He helps them out by doing that.

18         And one of the measures of doing some of the things

19  that you're doing in terms of -- I guess it's for purposes of

20  -- I don't mean to do air quotes.  Sorry.  It's for the

21  purposes of -- it's like a security measure when you're working

22  in Haiti because, you know, again, poverty being what it is in

23  Haiti, it's a measure of -- it's a recordkeeping when you're

24  giving out bonuses.  There was a way that Dr. Baptiste

25  explained it to me, and given that it was his clinic and he

1    does this all the time, it made sense to me at the time.

2    Q.    Okay.  He did not explain it as NOAH donations, correct?

3    A.    It was -- his clinic is connected to NOAH.  I think it

4    was.

5    Q.    Did he provide any other explanations for the cash in the

6    photographs that were sent to the undercover agent?

7    A.    Not that I recall.

8    Q.    Now, Mr. Baptiste indicated to you that he wanted to

9    proceed to trial?

10   A.    Well, that was our discussion.  I sort of -- not sort of.

11   I pushed him there because I believe in his innocence.

12   Q.    You discussed the Government's charges against

13   Mr. Baptiste with him?

14   A.    I did.

15   Q.    You discussed the Government's evidence against

16   Mr. Baptiste with him?

17   A.    The ones that I was able to open.

18   Q.    Well, for example, let's go through some of the evidence.

19   Did you discuss the Government's cooperating witness in this

20   case against Mr. Baptiste?

21           MR. FICK:  I just request some time frame on these

22   questions.

23   A.    Yes, please.

24   Q.    Since you were retained in the summer of 2017.

25   A.    Did I discuss cooperating witnesses?

1  Q.   The Government's cooperating witness, the informant in

2  this case, did you discuss the Government's informant?

3  A.   Oh, yes.  Yes.  Well, we had discussions of us trying to

4  determine who that person may have been.

5  Q.   Okay.  And did you discuss with Mr. Baptiste and with

6  Mr. Hinton who you thought that was and tried to come up with a

7  defense against that person's testimony?

8  A.   Right.  We had discussed who that person might have been,

9  and we formulated, you know -- we were trying to figure out why

10 they did this in the manner that they did it, but we talked

11 about how we would handle that.

12 Q.   Okay.  And did you review the FBI 302s, the reports that

13 the FBI wrote in this case?

14 A.   The ones that I was able to open and make sense of, I did.

15 Q.   Can you identify a particular 302 that you were unable to

16 open?

17 A.   Not specifically, no.

18 Q.   The 302s were produced in PDF format, correct?

19 A.   Yes.

20 Q.   They were not audio 302s, they were not video 302s; they

21 were simply all PDFs, correct?

22 A.   Well, I had difficulties opening them, and it took a while

23 and it was a late date when I finally realized what was going

24 on and I had to spend time trying to play catchup.

25 Q.   Can you identify a particular 302 that you clicked on and

1    could not open?

2    A.    Today I couldn't tell you.

3    Q.    You actually filed a motion to suppress statements made to

4    the FBI in this case, correct?

5    A.    Right.  And that was based off of information that I had

6    from Dr. Baptiste, and that's how we formulated the affidavit

7    for the motion to suppress.  And based off of what I

8    believed -- again, based off of what Dr. Baptiste told me, that

9    the agents, when they finally revealed themselves as FBI

10   agents, the timeline in which they were questioning that night

11   Dr. Baptiste, and that's what I based it off of.

12   Q.    Is it your testimony here today that you did not review

13   the FBI 302s pertaining to the FBI's interview of Dr. Baptiste

14   before filing the motion to suppress?

15   A.    No.  I was operating under the theory that there was no

16   actual recording because the recording that night with

17   Dr. Baptiste and one of the agents in Miami, it went from a

18   restaurant into -- the recording I had went from a restaurant

19   and then into an elevator, and the sound in the elevator was

20   really muffled.  The conversation was really off.  You couldn't

21   hardly hear it.  And then they went up to a room, and I

22   questioned Dr. Baptiste as to what happened there.

23          The agent was with Dr. Baptiste in the room, and then

24   there was a knock on the door and the agent went to the door,

25   opened the door, and there was a couple of voices.  You

1    couldn't hear really what they said; then I found that odd,

2    what have you; and then the agent went into the rest room.  He

3    used the rest room, and they turned off -- he had signed off.

4    And so my question to Dr. Baptiste is what happened after that,

5    and he explained to me in his best of his memory recollection,

6    he told me what happened.  So I just based my motion to

7    suppress off of that information.

8    Q.    So, Mr. LaRoche, I'm not asking about recordings.  You

9    just described a recording that you reviewed of a meeting

10   between Joseph Baptiste and Undercover Agent Peter in Miami?

11   A.    Yes.

12   Q.    That is a recording?

13   A.    Yes.

14   Q.    That you reviewed, correct?

15   A.    Yes.

16   Q.    Okay.  After Peter left -- as you just testified, there

17   was a knock.  Peter left the recording turned off, and the FBI

18   agents started talking to Dr. Baptiste as FBI agents, not

19   undercover?

20   A.    There was two written reports.

21   Q.    Correct.

22   A.    There's two written reports, one by a female agent and one

23   by the male agent in this case here.  I read those reports, and

24   based off of that as well, just thinking about it now, based

25   off of that, that's what I drafted my motion to suppress off

1  of.

2  Q.   Okay.  So you were able to review the FBI reports, the PDF

3  documents that were reports, correct?

4  A.   And if my recollection serves me right, and it might not,

5  but they were short reports basically describing what happened

6  after the main agent that was with Dr. Baptiste left the room.

7  Q.   Correct.  So in your review of those reports, you then saw

8  that Dr. Baptiste admitted to FBI that he offered jobs to

9  government officials in Haiti, correct?

10  A.   And that wasn't my reading of it but....

11  Q.   I'm sorry?

12  A.   That wasn't my reading of it.  I'd have to see the report

13  again.

14  Q.   Okay.  Now, you talked to Dr. Baptiste about what happened

15  during his meetings with the undercover agents in Boston,

16  correct?

17  A.   Yes, at the first meeting, because wasn't there two

18  meetings in Boston?

19  Q.   Correct.

20  A.   It was an initial one -- I'm sorry I'm asking you

21  questions.  But, yes, I did have a conversation with

22  Dr. Baptiste.

23  Q.   And you also talked to Dr. Baptiste about what he said in

24  his interview to the FBI agents when they confronted him in

25  Miami, correct?

```
 1   A.   Yes, I did.

 2   Q.   And you shared your correspondence with the government

 3   with Dr. Baptiste, correct?

 4   A.   Specifically when?  I'm sorry.

 5   Q.   In general it was your habit to share the

 6   correspondence --

 7   A.   Oh, yes.

 8   Q.   -- correct?

 9          And you discussed potential defense strategy with

10   Dr. Baptiste?

11   A.   We had a strategy, yes.

12   Q.   And that strategy included arguing that Dr. Baptiste did

13   not have a meeting of the minds with the FBI undercover agents,

14   correct?

15   A.   Yes.

16   Q.   And that strategy included arguing that Dr. Baptiste did

17   not have a meeting of the minds with Mr. Boncy to bribe

18   government officials?

19   A.   Yes.

20   Q.   And while you testified on direct that you didn't think

21   you had enough on an entrapment defense, your strategy included

22   highlighting the FBI's, I would say, misconduct or not

23   perfectly ethical conduct, in your view, in this case?

24   A.   Counsel, that would have been my way of trying to

25   back-door it in, yes.
```

1    Q.    Correct.  That was a strategy that you employed in this

2    case because you did not have enough to legally argue

3    entrapment, correct?

4    A.    I was led to believe that.  I was led to believe that.

5    Q.    Well, you were led to believe that in your discussions by

6    e-mail with Mr. Jason Hinton and State Prosecutor Arielle

7    Hinton, correct?

8    A.    It was more -- and forgive me.  It was more Jason.  I

9    don't remember -- unless you can show me something that I had

10   with Arielle, but I don't remember that.  The bulk of that

11   conversation was me explaining to Jason what I had learned

12   about why I couldn't run with the entrapment.  Because

13   initially when I first took on the case, that's what I thought

14   was automatic, was entrapment.

15   Q.    Okay.  But you -- after research and discussion, you made

16   a decision that you did not have enough to proceed with the

17   entrapment defense, correct?

18   A.    That's what I was led to believe, yes.

19   Q.    As you just -- well, I guess led to believe, by who?  Who

20   are you led to believe this?

21   A.    I talked to other lawyers, other defense attorneys, and

22   they sort of -- not sort of.  I was led to believe that it

23   wouldn't have been an effective enough argument given the facts

24   that I was describing it to them.

25   Q.    Okay.  And, Mr. LaRoche, you were admitted to the bar in

1    2003.  That's about 16 years ago, correct?

2    A.   Yes, ma'am.

3    Q.   And you were a state prosecutor for four years?

4    A.   Yes, ma'am.

5    Q.   And it's important for state prosecutors to know what

6    entrapment is, correct?

7    A.   I agree with you, yes.

8    Q.   So it's not accurate to say that you were led to believe.

9    You made a professional decision that you could not proceed

10   with an entrapment defense, correct?

11   A.   Well, I argued it unsuccessfully to other attorneys.

12   That's how I -- because literally I thought I had it right on

13   in terms of that strategy because, I mean, to the layperson,

14   you explain the facts of this particular case, and everybody

15   screams the same thing, oh, he got trapped up, and so it was

16   what it was in terms of --

17   Q.   Okay.  So you just testified that you attempted to

18   back-door that argument in?

19   A.   During the -- right.

20   Q.   And that was sort of a jury nullification argument that

21   you presented to the jury, correct?

22   A.   Well, that was in my opening is what I did, but I didn't

23   push it beyond that.

24   Q.   And, in fact, in response to the Government's motion in

25   limine in jury nullification, you filed an objection, and that

1    objection was granted by the Court, correct?

2    A.    Yes.

3    Q.    Okay.  So that was part of your defense strategy is to

4    argue about the FBI's bad conduct and the lack of conspiracy,

5    correct?

6    A.    I attempted to do that, yes.

7    Q.    Okay.  And was there anything else that was part of your

8    defense strategy in this case?

9    A.    The long and short of it, again, I stood on what I

10   believed was explained to me by Dr. Baptiste in terms of the

11   facts, and I basically ran with that in terms of, again, trying

12   to paint the best picture of Dr. Baptiste that I could.

13   Q.    Based on information that you received from Dr. Baptiste,

14   correct?

15   A.    Of course.  Of course.

16   Q.    And based on information that you discussed with Jason

17   Hinton, correct?

18   A.    Amongst others, yes.

19   Q.    Okay.  Well, so who else was part of the legal team in

20   this case?

21   A.    It was not a question of being part of the legal team.  I

22   spoke to -- I would have conversations with Attorney Hinton

23   about these things, and again, he is an attorney.  I had

24   conversations with him.  And I would have conversations with

25   other friends of mine who are attorneys, defense attorneys, and

1    they would say things that I didn't always agree and I tried my

2    strategy.

3    Q.    Okay.  So you were bouncing off your ideas about this case

4    with other lawyers whose judgment you trusted?

5    A.    Yes.

6    Q.    Okay.  Now, you testified about potential witnesses, and

7    you testified that you spoke with Alex Baptiste, who is an

8    unindicted co-conspirator, correct?

9    A.    Yes.

10   Q.    Did you speak to him -- well, you spoke to him about

11   potential evidence that you could use in your defense of

12   Dr. Baptiste, correct?

13   A.    I wouldn't phrase it like that.

14   Q.    Well, what evidence did you discuss with Alex Baptiste?

15   A.    When I would talk to him, it sounded more -- in hindsight,

16   it sounded more to me that we spent more time talking about

17   Dr. Baptiste's good nature, his character, as opposed to

18   exactly what the government was saying, because, you know,

19   there's -- with all due respect to any member of the FBI,

20   there's a distrust, and so when you hear something that they

21   say, you're not going to give it the same credence that you

22   give anybody else.  So we spent a lot of time talking about

23   Dr. Baptiste's just good nature.

24   Q.    Did you discuss with Alex Baptiste getting bank records

25   from Haiti?

1  A.   That would have been during -- I would have said that

2  would have been during the trial that might have came up, but I

3  don't recall.  I don't remember if I spoke -- maybe the week

4  before there were documents that I believed would have

5  showed -- would have proven what Dr. Baptiste and I had talked

6  about in terms of, you know, where money was being moved around

7  to, if there was any money being moved around, or what, if any,

8  monies Dr. Baptiste had invested, you know, in Haiti.  But it

9  was sort of like a general conversation, and I don't believe

10  during the week of the trial that I actually spoke to him.  I

11  think it was like a couple of weeks before.

12  Q.   Did you ask Alex Baptiste to testify on behalf of

13  Dr. Baptiste?

14  A.   No, I did not.

15  Q.   And did you make that decision after considering the

16  evidence in this case?

17  A.   I made that decision based on the fact that I didn't think

18  I had resources to have him come from Haiti to the United

19  States, and also -- I just didn't see, again -- I didn't see

20  anybody really coming from Haiti for trial.

21  Q.   As an unindicted co-conspirator, do you think Alex

22  Baptiste would have provided helpful testimony in this case?

23  A.   In defense of his brother, I believe so.

24  Q.   You received transcripts in this case of wire calls

25  between Alex Baptiste and Joseph Baptiste?

1   A.   Yes, I did.

2   Q.   Okay.  And do you think the government would have crossed

3   Alex Baptiste on those wire calls had he testified?

4   A.   Yeah, they would have.  The government would cross, yeah.

5   Q.   And that cross-examination would have hurt Dr. Baptiste's

6   case, correct?

7   A.   I can't speak for how Alex would have responded.

8   Q.   Now, you discussed Baptiste's charitable work in Haiti

9   with him, correct?

10  A.   Yes.

11  Q.   With Dr. Baptiste?

12  A.   I did.

13  Q.   You discussed his dental practice?

14  A.   Yes.

15  Q.   And you discussed his access to money in Haiti?

16  A.   Yes.

17  Q.   You shared drafts of your filings with him, correct?

18  A.   Yes.  Before I would send them off, I believe so, or I

19  spoke to him about it.

20  Q.   And you shared the final filings with him as well,

21  correct?

22  A.   I had conversations with him, I believe.

23  Q.   You discussed your opening statement with Dr. Baptiste?

24  A.   Yes.

25  Q.   And you discussed your thoughts on closing with

1    Dr. Baptiste?

2    A.    Yes.

3    Q.    Now, I'm just going to go through the billing statements

4    that you provided in this case.

5    A.    Yes.

6            (Government Exhibit 5 received in evidence.)

7    Q.    This is Exhibit 5.  And it starts at Bates 582.  And

8    directing your attention to the first line here, August 8th,

9    2017.

10   A.    Yes.

11   Q.    According to your billing statement, you met with

12   Dr. Baptiste and Attorney Jason Hinton and researched cases in

13   FCPA --

14   A.    Yes.

15   Q.    -- for a total of two hours, correct?

16   A.    Yes.

17   Q.    And then on the next day, August 9th, you continued to

18   research the FCPA for three hours?

19   A.    Yes.

20   Q.    Okay.  And just a couple of days later, on August 11th,

21   2017, you traveled to Boston to meet a prosecutor -- the head

22   prosecutor of the economic crimes unit and discussed the

23   preliminaries of the case and the statement of facts, correct?

24   A.    Yes, I did.

25   Q.    And this is the signed statement of facts that Baptiste

1  signed when he was represented by Benowitz, correct?

2  A.    Yes.

3  Q.    Now, on the next day, August 12th, you continued to do

4  research in FCPA for three more hours, correct?

5  A.    Yes.

6  Q.    And, in fact, the legal file that you handed over to the

7  new attorneys contained some of the legal research that you

8  printed out, correct?

9  A.    I believe so, yes.

10  Q.    And on August 14th you continued to do research and you

11  spoke to the AUSA, informing him that the doctor would not take

12  the plea?

13  A.    Yes.

14  Q.    And this was -- this communication was based on your

15  discussions with Joseph Baptiste on the statement of facts and

16  the evidence in the case, correct?

17  A.    Yes.

18  Q.    Now, it looked like on September 12th, 2017, you

19  sent -- you e-mailed the client, Hinton, and Attorney B. Steel.

20  Is that another attorney that was helping on this case?

21  A.    There was an attorney that we had a meeting with, but I

22  don't believe Dr. Baptiste actually retained him.  But he came

23  up to sort of enlighten us on what his position would have been

24  going forward.

25  Q.    Now, you logged this e-mail, but you didn't log every

1    single e-mail you sent to Joseph Baptiste or Jason Hinton,

2    correct?

3    A.    No.

4    Q.    Going to the next page, Bates 583, of your billing

5    statement.  On September 19th, 2017, you traveled to Fulton to

6    meet with Baptiste?

7    A.    Yes.

8    Q.    And that was three hours.  Fulton, that's where you met

9    with Baptiste at his office, correct?

10   A.    Fulton is his residence.

11   Q.    His residence.

12   A.    And then we went -- we spoke to the pretrial services

13   officer that was supervising him for the purposes of the bond.

14   Q.    Okay.  And then in October, next month, 12th of 2017, you

15   traveled Boston for arraignment, and you met with the client

16   then as well?

17   A.    Yes, I did.

18   Q.    Okay.  And then October 24th, you again traveled to

19   Boston, and you met with the AUSAs to hear recordings of my

20   client and the undercover agent, correct?

21   A.    Yes, I did.

22   Q.    So you heard recordings dating as far back as October

23   24th, 2017, almost two years before trial?

24   A.    Yes, that was in the presence of the Assistant U.S.

25   Attorney.

1    Q.    Okay.  And then four days later, on the 28th, you traveled

2    to the client's home to discuss those recordings that you heard

3    at the U.S. Attorney's Office, correct?

4    A.    To give him my opinion of what I heard, yes.

5    Q.    And then on November 18th, 2017, you again traveled to

6    Baptiste's house to discuss the case, and you -- it looks like

7    you could not play the recordings then, correct?

8    A.    Correct.

9    Q.    So at this point, November of 2017, you hadn't opened all

10   of the recordings in this case, correct?

11   A.    Correct.

12   Q.    But you had reviewed some of them at the U.S. Attorney's

13   Office already?

14   A.    Yes.

15   Q.    So there are no further entries beyond November 18th of

16   2017 in this log?

17   A.    Correct.

18   Q.    And the last billing entry is from October of 2018 --

19   A.    Yes.

20   Q.    -- Bates 596?  No billings after that.

21         You did work on this case after October of 2018,

22   correct?

23   A.    Yes.

24   Q.    You did work between October 2018 and the trial in June of

25   2019, correct?

1   A.   Yes, because it was two dates for trial.  It was going to

2   be the trial in December, and then once the government indicted

3   Mr. Boncy, I had to gear it up again in preparation for the

4   trial in June.

5   Q.   Okay.  So all the filings that were made in this case in

6   terms of the motions in limine, the trial brief, the voir dire,

7   that was done after October of 2018?

8   A.   It was done in preparation for the trial in June.

9   Q.   But it's not reflected in these statements?

10  A.   No, because the -- neither was the funding.  I created a

11  log for Dr. Baptiste for his records so that he knows payments

12  were made and here's what the payments were being used for.  So

13  he would make a payment and I would log it and then send him a

14  copy of the receipt.

15  Q.   Okay.  So other than court filings, you also communicated

16  with Dr. Baptiste between the last date on this billing

17  statement and the end of your representation, correct?

18  A.   Yes.

19  Q.   You continued to communicate with him by phone?

20  A.   Yes.

21  Q.   You continued to meet with him in person?

22  A.   Yes.

23  Q.   You continued to exchange e-mails?

24  A.   Yes.

25  Q.   Okay.  And that's not logged anywhere?

1    A.   No, because the log, if you look at it, was related to the

2    funding that was sent -- the payments that were sent, I should

3    say.

4            THE COURT:  How much more do you have?

5            MS. RUBIN SMITH:  Maybe another half an hour.

6            THE COURT:  All right.  Let's take 45 minutes, okay?

7    2:15.

8            (Luncheon recess taken from 1:33 to 2:15 p.m.)

9            MR. BASIL:  The week of February we would come back.

10   We understand the 17th the Court is not available.  I'm also

11   out of the country the week of the 17th, as is I think

12   Mister --

13           THE COURT:  It's school vacation week.

14           MR. BASIL:  I'm sorry?

15           THE COURT:  It's school vacation week.

16           MR. BASIL:  Yes, it is.

17           So any day of the first week of February, except

18   February 3rd, Your Honor, the government could be available.

19           MR. FICK:  So I think we have Insys on the 4th, Your

20   Honor, but the rest of the week....

21           THE COURT:  I have too much time here.

22           I don't have Insys on my calendar on the 4th.  Why is

23   that?

24           THE CLERK:  I don't know.  It's on mine.

25           MR. FICK:  I think it was just yesterday we scheduled

1   the joint restitution for that day.

2              THE COURT:  I have nothing on my calendar.

3              THE CLERK:  I don't know.  It's on mine here.

4              THE COURT:  Why would that be?

5              THE CLERK:  I don't know.  Maybe you did not shut it

6   down yesterday.  There's nothing else scheduled on the 3rd,

7   4th, 5th, 6th.

8              THE COURT:  I can't do the 3rd.

9              THE CLERK:  The 5th, 6th and 7th is all.

10             THE COURT:  The 5th or the 6th or both.

11             MR. FICK:  Why don't we start with the 5th and hope we

12  get done, but if we don't there's another day.

13             THE COURT:  Okay.

14             MR. FICK:  Our proposal would be not to start

15  Mr. Hinton until then so we don't break him up between days.  I

16  think we'll probably spend most of the rest of the time with

17  Mr. LaRoche today anyway.

18             THE COURT:  Okay.

19             MR. BASIL:  Your Honor, could we start those days as

20  we did today, 9:30 or after?

21             THE COURT:  Sure.

22             MR. BASIL:  Thank you.  February 5th.

23             THE COURT:  Do I have anything else scheduled that

24  day?

25             THE CLERK:  No.

1          THE COURT:  We could start at 10:00 if you want, we

2     could start at 9:30, whatever you want to do.

3          MR. BASIL:  How about we do 9:30 and get as much done

4     as we possibly can.

5          THE COURT:  9:30.

6          MR. BASIL:  Thank you, Your Honor.

7          MS. RUBIN SMITH:  Your Honor, should we leave the 6th

8     open in our calendars in case we need to continue to the 6th?

9          THE COURT:  I'm going to leave that to you, but I'm

10    guessing that there's not many people in this room that want to

11    come back for a third day.

12         MR. BASIL:  I love being here.

13         THE COURT:  I know you do.

14         MR. FICK:  Can we tell Mr. Hinton he can go today?

15         THE COURT:  Sure.  Make sure he knows he's coming back

16    on the 5th with his wife.  They can have, you know, a romantic

17    weekend in Boston and walk the Freedom Trail.

18         MR. BASIL:  Your Honor, whenever you're ready, we're

19    ready.

20         THE COURT:  I'm ready.

21                   CROSS-EXAMINATION, Continued

22    BY MS. RUBIN SMITH:

23    Q.   Mr. LaRoche, you were able to open up the discovery in

24    this case around April 2018 with the assistance of the U.S.

25    Attorney's Office, correct?

1    A.    Yes.

2    Q.    You had numerous phone calls with the prosecutors on this

3    case, correct?

4    A.    Correct.

5    Q.    During those phone calls, you challenged the Government's

6    evidence in this case?

7    A.    Correct.

8    Q.    You discussed your strategy in defending this case as

9    well, correct?

10    A.    Correct.

11    Q.    You reviewed the superseding indictment with your client,

12    correct?

13    A.    Yes, I did.

14    Q.    You made notes in the superseding indictment?

15    A.    Yes.

16          MS. RUBIN SMITH:  This is marked as Government's

17    Exhibit 6.  And this is BAP 78.

18          (Government Exhibit 6 received in evidence.)

19    Q.    Showing you the superseding indictment in this case,

20    directing you to BAP 80.

21          MR. BASIL:  Your Honor, I am just going to hand him a

22    copy.

23    A.    Yes.  Thank you.

24    Q.    So you took notes on this indictment, correct?

25    A.    Correct.  That's my handwriting.

1    Q.    So, for example, on Page 3 at Paragraph 13 where it says

2    "At Baptiste's direction, UC-2 wired $50,000 to nonprofit's

3    bank account as part of the bribery scheme," you annotated "Two

4    separate payments.  JB had letter before $50,000 was even

5    spent," correct?

6    A.    Correct.

7    Q.    And, for example, on Page 4 where there's discussion on

8    traveling to Boston to meet with the potential investors, you

9    annotated "An invitation of FBI, JB did not know of SEW

10   before," correct?

11   A.    Correct.

12   Q.    And, for example, on Page 5, at the discussion of the

13   November 13th, 2014 meeting with UC-1, you annotated that "FBI

14   held the meeting, JB was invited.  FBI agent said pay for play

15   not JB," correct?

16   A.    Correct.

17   Q.    These notes are made based on your discussions with Joseph

18   Baptiste?

19   A.    Yes.

20   Q.    These notes are made based on the evidence in the case?

21   A.    Yes.

22   Q.    And on Page 8 of this indictment, in Paragraph 36 where

23   there's a reference to a phone call on December 3rd, 2015,

24   between UC-2 and Baptiste, you annotated here "Joseph Baptiste

25   lies"?

1    A.    Yes.

2    Q.    Where there's a reference to using $25,000 to pay the

3    foreign officials?

4    A.    Yes.

5    Q.    And then further down in that paragraph where it says

6    Baptiste told UC-2 that he told Foreign Official 1 that he was

7    going to put foreign official on the payroll and hire him as an

8    advisor for the port project.  You annotated "Putting team

9    together" in quotes "1 left office"?

10   A.    Yes.

11   Q.    Okay.  That's also based on your review of the evidence

12   and discussions with Mr. Baptiste, correct?

13   A.    Correct.

14   Q.    Now, in your preparation for trial, you filed a motion to

15   suppress Mr. Baptiste's statements made to the FBI.  We talked

16   about that before the break, correct?

17   A.    Correct.

18   Q.    You also filed four objections to the Government's motions

19   in limine, on the statement of facts, the nullification

20   argument, arguments about public benefit of the Port Project

21   and charitable deeds of Mr. Baptiste, correct?

22   A.    Correct.

23   Q.    And all of those were decided in your favor by this Court,

24   correct?

25   A.    Correct.

1  Q.   And you successfully prevented the government from using

2  the signed statement of facts in its case in chief, correct?

3  A.   Correct.

4  Q.   Now, let's talk about Mr. Dwyer.  You communicated with

5  Mr. Dwyer during the trial, correct?

6  A.   Correct.

7  Q.   You discussed the evidence with Mr. Dwyer?

8  A.   Yes.

9  Q.   You discussed potential defense strategy with Mr. Dwyer?

10 A.   Yes.

11 Q.   You coordinated with Mr. Dwyer during the trial?

12         MR. DWYER:  Your Honor, I'm going to object.  I'm not

13 sure -- we're in a different privilege land here now in the

14 joint privilege.

15         THE COURT:  She's asking if he coordinated with you;

16 doesn't waive any privilege.

17         MR. DWYER:  Okay.

18 A.   I don't know if I would use the word "coordinate" because

19 that would imply that Attorney Dwyer and I saw eye to eye.  A

20 lot of times we didn't.

21 Q.   You discussed cross-examination with Mr. Dwyer, correct?

22 A.   Yes.

23 Q.   I'm going to show you BAP 915.

24         MR. BASIL:  Your Honor, I am going to hand him a copy.

25 Q.   This is Exhibit 7.

1          MR. DWYER:  Again, Your Honor, I'm going to raise an

2    objection.  This is joint defense but....

3          THE COURT:  I don't know what this is.

4          MR. DWYER:  It's a handwritten note from me to

5    Mr. LaRoche during the trial.

6    Q.   Mr. LaRoche, did you receive --

7          THE COURT:  Hold on a minute.  So if it's joint

8    defense, I don't think that privilege has been waived.

9          MS. RUBIN SMITH:  Okay.  That's fine.

10   Q.   Mr. LaRoche, you were asked about cross-examining the FBI

11   witnesses in this case, correct?

12   A.   Yes.

13   Q.   Okay.  And you testified that at times you chose not to

14   pursue cross-examination?

15   A.   Yes.

16   Q.   Okay.  Was that decision based on conversations with

17   Mr. Dwyer?

18   A.    It was interchangeable.  And when I say interchangeable,

19   meaning in my opinion there were instances where Mr. Dwyer was

20   doing a great job in terms of what he was doing with the case,

21   and I had some minimum conversation with Dr. Baptiste about

22   that.  And so I chose not to jump up and object under the

23   impression, and basically what I was seeing, that Mr. Dwyer was

24   already in that area, so I elected not to sort of beat the

25   horse.

1  Q.    Okay.  During the trial you received notes from Mr. Dwyer,

2  correct?

3  A.    Yes.

4  Q.    You reviewed those notes?

5  A.    Yes.

6  Q.    You discussed those notes with Mr. Baptiste?

7  A.    Not -- I don't know about all the instances.  As I say, I

8  think there were things that I actually initiated with

9  Mr. Dwyer, and in response, he responded, if he responded or if

10  he didn't respond, and I didn't really lean over and say hey,

11  this is what I'm talking about with Attorney Dwyer, no, I

12  didn't do that.

13  Q.    Your decisions on cross-examination were sometimes based

14  on those notes from Mr. Dwyer?

15  A.    You'd have to be more specific.  The only reason I'm

16  saying be more specific because Attorney Dwyer had his

17  direction and I had mine in terms of how we were proceeding

18  with the trial.

19  Q.    But after reviewing some notes with Mr. Dwyer, you

20  sometimes decided not to pursue a certain line of

21  cross-examination?

22  A.    Yes.

23  Q.    Now, you said that part of your strategy in this case was

24  arguing that there was no conspiracy, correct?

25  A.    Correct.

1  Q.   And Mr. Dwyer's strategy in this case was also that there

2  was no conspiracy, correct?

3  A.   Correct.  I guess that's Mr. Dwyer's position.

4  Q.   So you agreed with Mr. Dwyer's strategy?

5  A.   Yes.

6  Q.   And your client liked Mr. Dwyer's strategy?

7  A.   He accepted what I said to him.  My client, that is.

8  Q.   Now, you submitted jury instructions to the Court by

9  e-mail, correct?

10  A.   Correct.

11  Q.   And in those jury instructions you proposed a facilitation

12  payments defense, correct?

13  A.   I don't recall.  I'd have to see the instructions.

14  Q.   You were asked about the official act instruction by

15  defense counsel, correct?

16  A.   Yes.

17  Q.   And you recall Mr. Dwyer requested that instruction,

18  correct?

19  A.   I don't recall, no.

20  Q.   Mr. LaRoche, isn't it true that Mr. Dwyer argued to the

21  jury that your client stole the money that the FBI wired him?

22  A.   During his closing, I believe so, yes.

23  Q.   And the superseding indictment that we just reviewed, you

24  annotated "JB lies" next to the $50,000 paragraph, correct?

25  A.   Yes.

1    Q.    And isn't it true that in your closing you also argued

2    that Mr. Baptiste used the $50,000 to himself -- for himself?

3    A.    Yes, because the evidence was already there, that proceeds

4    that he received didn't make it to Haiti, and so the accusation

5    was already there.  And we decided -- and I say we in

6    discussion, that we wouldn't downplay it in front of the jury.

7    Q.    And that's helpful for your defense, that there's no

8    conspiracy to bribe officials, correct?

9    A.    Yes.  Yes.

10   Q.    Now, let's talk about Mr. Hinton's closing.  Mr. Hinton

11   wrote the closing?

12   A.    He drafted the ideas that he and I were batting around,

13   yes.

14   Q.    You reviewed the closing?

15   A.    I did, and I knew it was coming that way because he

16   wrote -- I was impressed by his, lack of a better term, his

17   eloquence, and so we discussed it all night and he drafted and

18   I, you know, I read it.

19   Q.    Mr. Hinton was present during the entire trial, correct?

20   A.    Yes.  Well, actually, no.  I don't think he was there for

21   the beginning.  He came in after, I believe, because he had a

22   work conflict -- a conflict with his schedule, so I don't think

23   he was there for the opening, and he might have started a

24   couple of days or a day or two, my recollection.

25   Q.    He was there for most of the witness testimony in the

1    case?

2    A.    I believe so, yes.

3    Q.    And you reviewed the closing that he wrote?

4    A.    Yes.

5    Q.    You liked the closing that he wrote?

6    A.    Yes.

7    Q.    Your client reviewed the closing?

8    A.    I believe so.

9    Q.    Your client liked it?

10   A.    He didn't tell me otherwise, no.

11   Q.    Now, you produced your file to Mr. Baptiste's new

12   attorneys?

13   A.    Correct.

14   Q.    You produced to them only what you had printed out in your

15   file, correct?

16   A.    Correct.  I had everything in a big briefcase and I just

17   put it in a box and mailed it off to them.

18   Q.    Did you go through your e-mail account to print out every

19   e-mail that was sent related to this case, between you and

20   Mr. Baptiste and Mr. and Mrs. Hinton, to put that in the box

21   that you gave over to the attorneys?

22   A.    To the best of my knowledge, I think I did, and the reason

23   I say that was because this -- the hours that I recorded in

24   this dunning statement comes through with the e-mails.  So I

25   compiled them all together and I gave them whatever I had.

1   Q.   So is it your testimony that in preparing the materials

2   for the new attorneys, you went through your e-mails and

3   printed out all the e-mails that were relevant?

4   A.   Yes.

5   Q.   Now, you testified that you didn't hand over all of your

6   written notes, correct?

7   A.   Yes.  The written notes on the legal pad, I think we

8   discussed that, no.

9   Q.   Okay.  I believe you testified that you lost some notes

10  during your three moves?

11  A.   Yes.

12  Q.   And then in terms of the notes that were in the trial

13  suitcase, you discarded those?

14  A.   Yes.

15  Q.   And you got rid of those notes because you didn't think

16  that they were relevant to the new attorneys in this case?

17  A.   Yeah, I thought it was gibberish.

18  Q.   But they were your notes in relation to this case?

19  A.   Yeah.  And I wouldn't have been able to -- the stuff that

20  I wrote I wouldn't have been able to explain because as I

21  have -- my handwriting is not the best, and sometimes I just --

22  random thoughts I put down or --

23  Q.   And that would include notes on transcripts that you

24  reviewed?

25  A.   Yes.

1   Q.   And notes on video and audio recordings that you reviewed?

2   A.   To a certain extent, yes.

3   Q.   And notes --

4   A.   The notes that I wrote inside the -- this thing here, the

5   indictment, for example.

6   Q.   And that would also include potentially notes based on

7   your conversations with Mr. Baptiste?

8   A.   That wasn't really my sort of custom or practice, but in

9   retrospect.

10  Q.   So you don't really know the universe of the notes that

11  you destroyed in this case?

12  A.   No, because my legal pads, again, I prepared -- the things

13  that I typed up from the legal pad, I just basically got rid of

14  because I had already typed up the information in either an

15  e-mail or something I was presenting, a motion, what have you.

16  Q.   Did Mr. Baptiste's new attorneys ask you to preserve all

17  your notes?

18  A.   Yes, they did.  And, like I said, by this point -- when I

19  got back to Virginia after the trial, I did sort of like do a

20  regular housecleaning, housekeeping to get rid of things and

21  things that were taking up space.  And it wasn't just this

22  case.  It was my other case as well.  Again, I have a system of

23  writing, jotting things down in a legal pad, and then

24  transferring them either into an e-mail or putting them towards

25  when I'm writing a motion of some sort that I'm going to

1    present to the court.

2    Q.    Now, let's talk about Jason Hinton.  You didn't disclose

3    to the court that Jason Hinton was an attorney, correct?

4    A.    I did when he came here.  I explained to the judge,

5    because my angle -- sorry.  My angle of having Mr. Hinton here

6    was really to operate my computer in the event I was going to

7    present something, I was going to use for purposes of showing

8    to the jury, but then found I couldn't do it that way.

9    Q.    Is it your testimony today that you disclosed to the Court

10   that Mr. Hinton was an attorney?

11   A.    I believe so, yes.

12   Q.    Did you disclose him as an attorney that was working with

13   you on this case?

14   A.    I said that he'd be helping me out.  I believe I told

15   Judge Burroughs that he would be helping me out, assisting me

16   with the computer.

17   Q.    Did Mr. Hinton help you with the computer?

18   A.    Ultimately that didn't happen.

19   Q.    But he took notes during the trial, correct?

20   A.    Mr. Hinton?

21   Q.    Yes.

22   A.    I guess so, yes.

23   Q.    And you discussed the day's proceedings with him after the

24   trial day was over?

25   A.    Definitely.

1   Q.   Now, let's go to Exhibit 1, which is the binder with the

2   e-mails.

3   A.   Your binder or?

4        MR. BASIL:  May I show him?

5   A.   Yes?

6   Q.   So if you look at Tab 1, Bates 924.

7   A.   Yes.

8   Q.   And just directing your attention to the middle e-mail,

9   Tuesday, May 14th, at 3:24?

10  A.   Yes.

11  Q.   It looks like an e-mail from you to Jason Hinton?

12  A.   Yes.

13  Q.   "I would have to talk to his lawyer.  What I'm thinking is

14  writing to the government and put them on notice that we plan

15  on putting Viard on to put the case in context as to how JB was

16  approached and questioning him about his bringing Joe to the

17  FBI at their request."  So that's you and Mr. Hinton discussing

18  the informant in this case and calling him as a witness,

19  correct?

20  A.   Yes, yes.

21  Q.   I'm sorry.  Going back.  Same Bates, 24, right above that,

22  Jason writes back to you.  "I think so, too.  Do you think we

23  could get Rudy to sign an affidavit regarding the contents of

24  his convo with Viard where Viard says he spoke with Rudy to

25  explain why he made allegations to Feds having to do with his

1  wife's case," question mark.  So that's Jason Hinton opining to

2  you as to who could be a potential witness on the case as well

3  for Baptiste?

4  A.   Yes.

5  Q.   Going to Tab 2, Bates 937.  This is you forwarding to

6  Baptiste and cc'ing Jason Hinton on the discovery letter that

7  you sent to the prosecutors, correct?

8  A.   Yes.

9  Q.   I promise we're not going to do the whole binder.  We are

10  just going to do maybe five more.

11       But Tab 3, starting at Bates 941, the defense

12  attorney showed you this one as well.  It's a draft letter to

13  the Prime Minister of Haiti?

14  A.   Yes.

15  Q.   And going to Bates 943, this is a letter that you drafted,

16  and you say the legal defense team is compiling the final

17  stages of the information we will need to properly defend

18  Dr. Baptiste, and this is a letter from October 22nd, 2018.

19  The legal defense team including Mr. Hinton, correct?

20  A.   Correct.

21  Q.   Including Arielle Hinton?

22  A.   No.

23  Q.   So you're referring to Mr. Hinton and yourself, correct?

24  A.   Yes.

25  Q.   Now, Tab 4, Bates 944, this is an e-mail from April 1st,

1    2019, from you to Jason Hinton.

2    A.    Yes.

3    Q.    Where you say "Between you and me, I won't be stipulating

4    to these matters.  What do you think?"  And below that is an

5    e-mail from AUSA Basil to you about the Government's request

6    for stipulations.  So you discussed your thoughts on the

7    stipulations with Hinton, correct?

8    A.    Yes.

9    Q.    This is 4(B)(1).  It's Bates 932.

10   A.    Okay.

11   Q.    And so you have to go back a little bit.  It's an e-mail

12   from Jason Hinton to you and Joseph Baptiste on FCPA and his

13   analysis?

14   A.    I'm not there yet.

15   Q.    Uh-huh.

16   A.    Sorry.  932, you said?

17   Q.    932, yes.

18   A.    Yes.

19   Q.    Okay.  And it's Jason Hinton sending you an e-mail on

20   analysis of the FCPA?

21   A.    Yes.

22   Q.    And how it applies to the facts in Baptiste's case?

23   A.    Yes.

24   Q.    And number one, it says "In our case there is no

25   government offering."  So "our case," that means you and Jason

1    Hinton's case, correct?

2    A.    Dr. Baptiste's, yes.

3    Q.    This is Bates 941.  It's a couple of pages after the

4    document that I just showed you, and there's an e-mail at the

5    bottom here from Jason Hinton to you cc'ing Eric Walcott and

6    Joseph Baptiste, and he says here "Accordingly, communications

7    with him are not privileged."  He is referencing Eric's role.

8    "To protect you, Joe and Eric, it is time to limit his

9    involvement."

10   A.    Yes.

11   Q.    So Jason Hinton there is giving his analysis on privileged

12   communications, correct?

13   A.    Correct.

14   Q.    And Tab 5, Bates 947, an e-mail from April 18th of 2019

15   from you to Jason Hinton?

16   A.    Yes.

17   Q.    With your remaining objections to the Government's motions

18   in limine, and these are drafts that you're sending to Hinton,

19   correct?

20   A.    Correct.

21   Q.    And you filed these objections to the motions in limine,

22   correct?

23   A.    Correct.

24   Q.    Now, going to Tab 7, Bates 959, it looks like there's an

25   attachment of a transcript.  That's actually attached.  And

1    it's a conversation between Joe Baptiste and Alex Baptiste --

2    A.    Yes.

3    Q.    -- from the wiretap?

4          And if you look at Bates 960, there's an e-mail from

5    Jason Hinton to you cc'ing Joseph Baptiste with an analysis of

6    that transcript where he says a few things jump out at me, and

7    he gives page references and line references, correct?

8    A.    Yes.

9    Q.    And then on that first page, Bates 959, Jason Hinton is

10   forwarding that to wife r-e-l at mac on May 20th, and then

11   above that you respond to Jason Hinton and Joseph Baptiste

12   about the transcript and say that you will call later this

13   morning, correct?

14   A.    Yes.

15   Q.    Now, if you look at 962 of that same tab.

16   A.    Yes.

17   Q.    It's an e-mail from Joe.  On 961 it starts at the bottom,

18   from Joe to you and Jason Hinton, and it's the same analysis of

19   the transcript.  And he says "We have a good team, Jason,

20   Arielle and yourself," being you.  "I'm confident we will beat

21   them.  Let's get ready."  Do you see that?

22   A.    Yes.

23   Q.    Going to Tab 15, Bates 1001.

24   A.    Yes.

25   Q.    It looks like you e-mailed Jason and Joseph Baptiste the

 1   draft of the Government's voir dire, correct?

 2   A.   Correct.

 3          MS. RUBIN SMITH:  May I have just one moment, please.

 4          THE COURT:  Sure.

 5          (Pause.)

 6          (Attorneys confer.)

 7   Q.   Now, going back to Tab 19, Bates 1082?

 8   A.   Yes.

 9   Q.   It's an e-mail about entrapment from Arielle Hinton to

10   Joseph Baptiste, you and Jason Hinton?

11   A.   Yes.

12   Q.   And you see where she says "Below are the elements of

13   entrapment.  Based on the information I know about the case,

14   and Donald and Jason know more than I do, I'm not sure we can

15   prove all the elements"?

16   A.   Yes.

17   Q.   You received that e-mail, correct?

18   A.   Yes.

19   Q.   We skipped over this, under Tab 4 and Bates 929?

20   A.   929?

21   Q.   Yep, yep.  Tab 4.  It's an e-mail from Arielle Hinton to

22   Jason Hinton, Donald LaRoche, and Joseph Baptiste.  And you see

23   where it says "In reviewing Jason's analysis and the indictment

24   itself, I have a few points I would like to include that should

25   be part of the overall trial strategy."  You received this

1    e-mail from Arielle Hinton, correct?

2    A.    Yes.

3    Q.    Sitting here today, can you articulate a single recording

4    that you saw at trial that you had not been able to review

5    before trial?

6    A.    I can't.  I'm sorry.  I cannot.

7    Q.    Earlier in the proceedings Mr. Dwyer objected to one of my

8    questions on the ground of a joint defense privilege.  Do you

9    recall that?

10   A.    Early -- during the trial?

11   Q.    Today?

12   A.    Today.

13   Q.    Today.  Do you remember Mr. Dwyer, when I asked a

14   question, he stood up and said there was a joint defense

15   privilege?

16   A.    Oh, I guess, yes.

17   Q.    Now, at trial did Mr. Dwyer call any witnesses from Haiti?

18   A.    To my recollection -- I don't think -- no, he didn't.

19   Q.    Any experts on Haitian law?

20   A.    No, not that I know of.  No, not that I recall.

21   Q.    Any experts on political contributions in Haiti?

22   A.    No.

23   Q.    Any experts on employment law in Haiti?

24   A.    Not to my recollection, no.  No.

25   Q.    And in your opinion, he put on a good defense, you

1    testified, correct?

2    A.    Correct.

3    Q.    Okay.  And you testified that he's an excellent lawyer,

4    correct?

5    A.    Correct.

6    Q.    And his client was also convicted, correct?

7    A.    Correct.

8    Q.    Now, Mr. LaRoche, you talked about playing Monday morning

9    quarterback earlier?

10   A.    Yes, ma'am.

11   Q.    And that's what we're doing here today, correct?

12            MR. FICK:  Objection.

13            THE COURT:  Sustained.

14   Q.    You feel bad that Mr. Baptiste was convicted?

15   A.    Of course.

16   Q.    Yes.  And you testified you think he's innocent, correct?

17   A.    Of course.

18   Q.    And you want Mr. Baptiste to get a new trial, correct, to

19   get a second chance?

20   A.    I mean, isn't that what we're all here for, is to deal

21   with that issue?  I mean, again, in my opinion, I worked hard,

22   and no one wants to see someone lose if you're working so hard

23   for the case.

24   Q.    You want to help Dr. Baptiste, correct?

25   A.    I want to help him?  I don't represent him anymore.

1    Q.    But you feel bad that he got convicted?

2    A.    On my watch, yes.

3    Q.    Okay.

4          MS. RUBIN SMITH:  Nothing further.

5          MR. FICK:  Very brief, Your Honor.  Only five minutes,

6    maybe.

7                      REDIRECT EXAMINATION

8    BY MR. FICK:

9    Q.    Just a few things, Mr. LaRoche.  A few minutes ago, the

10   prosecutor asked you about Bates Number 1082 in the binder, an

11   e-mail about the entrapment defense?

12   A.    Yes.

13   Q.    What's the date on that e-mail?

14   A.    June 5th, 2019.

15   Q.    So that's just about five days before the start of trial?

16   A.    Correct.

17   Q.    That's when you're getting advice from Arielle Hinton

18   about whether there's a viable entrapment defense?

19   A.    Correct.

20   Q.    The prosecutor showed you some e-mails between you and

21   Mr. Hinton about Viard, the presumed informant in the case,

22   remember that?

23   A.    Yes.

24   Q.    And there was discussion -- those e-mails concerned

25   discussion about potentially calling of this person as a

1    witness to impeach them in the investigation?

2    A.    Correct.

3    Q.    Ultimately did you call Mr. Viard?

4    A.    No, I did not.

5    Q.    And then -- so I apologize.  I might have asked this

6    earlier.  Who was counsel of record in this case?

7    A.    Donald LaRoche.

8    Q.    Was anyone else counsel of record?

9    A.    No.

10    Q.    Could anybody else examine a witness?

11    A.    No.

12    Q.    Could anybody else file a pleading for Mr. Baptiste --

13    Dr. Baptiste?

14    A.    No.

15    Q.    Could anybody else give an opening or closing?

16    A.    No.

17    Q.    You testified about getting advice, feedback, ideas from

18    the Hintons and others, correct?

19    A.    Correct.

20    Q.    Whose responsibility at the end of the day was it

21    on Dr. Baptiste's behalf to exercise judgment and make

22    conclusions about what advice to take or reject?

23    A.    That would have been my decision.

24    Q.    And for any advice that you thought was good, whose

25    responsibility was it to sort of execute on the advice?

1    A.    That would have been my position.

2              MR. FICK:  I believe we're done, Your Honor.

3              MS. RUBIN SMITH:  No recross.

4              THE COURT:  All right.  You can step down.

5              THE WITNESS:  Am I excused, Your Honor?

6              THE COURT:  Yes, you're excused.

7              THE WITNESS:  Thank you.

8              THE COURT:  So you have another half hour today.  Do

9    you want to use it or defer to the February date?

10             MR. FICK:  I think our conclusion was starting a

11   witness and not getting very far and then having all the issues

12   associated with having an examination pending would be sort of

13   a poor place to stop.  So I think, unless....

14             THE COURT:  That's really just a yes or no question.

15   I'm not pressing you.

16             MR. FICK:  I think no, we have nothing further to

17   present today.

18             THE COURT:  If you don't, I'm happy to recess.

19             Mr. Basil?

20             MR. BASIL:  Your Honor, given where we are and the

21   testimony that's come and what the court has now found

22   Mr. Hinton's role in the case to be, are we not now entitled to

23   some further amount of discovery from his communications,

24   discussions with Arielle Hinton?  I realize there's a marital

25   communication privilege that would also apply, but there's an

1    attorney relationship.  I don't even know how to parse that.

2    So far we don't have these materials.  I don't have his notes.

3    He took notes during the trial as well.  Mr. LaRoche has

4    testified to that today.  We do not have those.  Should we not

5    have comparable materials to what we have already received?

6              THE COURT:  I'm not sure he's under anybody's control,

7    but you're welcome to ask him for them and you should ask him

8    for them.

9              MR. FICK:  I think we can confer with our witness and

10   confer with the government, and I hope avoid any controversy.

11   I would say sort of bigger picture.  I mean, I understand and

12   appreciate sort of letting the government poke the case, sort

13   of the argument as it were.  I'm a little bit -- I have some

14   difficulty understanding, you know, whether Clarence Darrow or

15   the best lawyer ever or the Hintons or whoever was giving

16   advice to Donald LaRoche, I'm not sure how that matters if what

17   we're talking about here is Donald LaRoche's performance.  To

18   the extent the Court is indulging their inquiry, you know,

19   we'll be reasonable about facilitating that.

20             THE COURT:  Those conversations in the context of

21   representing him can evidence a strategy, right?  They can

22   evidence reasonable litigation choices, and he's entitled to

23   poke at them.  But I don't know who is under control of the

24   witness.  You're both free to call and ask him to produce what

25   he has.  He should certainly understand he should be preserving

```
 1   whatever he has.  That seems obvious from his ethical

 2   obligations.  I mean, if you have them or can get them, you

 3   should give them to him, and you should feel free to ask.  I

 4   mean --

 5         MR. FICK:  I think within the next handful of days we

 6   can confer with the government and resolve this, yes.

 7   Understanding that the Court has found an implied waiver and

 8   we're operating where this stuff is being handled in that way

 9   with the understanding --

10         THE COURT REPORTER:  Sorry.  My computer and steno

11   machine froze.  Can I start a new file?

12         THE COURT:  Sure.

13         (Pause.)

14         THE COURT:  So I'm just -- the court reporter had a

15   mechanical failure, and what's the last thing that's reflected

16   on the record is me saying that those conversations amongst the

17   three attorneys could evidence reasonable litigation choices,

18   and I think that I went on to say that I wasn't sure who

19   controlled Mr. Hinton, but you should feel free to -- you

20   should ask him to cough up what he has.  You may also ask him

21   to produce what he has.  He has an ethical obligation to

22   preserve what he has under the rules, and I think at that point

23   Mr. Basil stood up, and -- well, go ahead.  You can.

24         MR. BASIL:  So, Your Honor, from our point of view,

25   the person who controls Attorney Hinton at this point is Your
```

1    Honor could order him to produce these materials.  There is now

2    admitted evidence in this case that Mr. Hinton and Mrs. Hinton

3    were part of the legal team.  The fact that he was not the

4    attorney of record, I suppose that would mean that every

5    associate at a law firm who is not an attorney of record is

6    also irrelevant.

7         THE COURT:  I am happy to order him to produce what he

8    has, but I am not in a position -- well, I don't want to be the

9    one that goes through all of his documents and decides what is

10   relevant is my point.  I'm happy to order him to produce what

11   he has, but that is produced to who and who's going to go

12   through it to make sure it's within the rubric of what we're

13   discussing.

14        MR. BASIL:  Your Honor, my understanding of the way

15   this would work is what has worked previously.  He would be

16   ordered to produce these materials to Mr. Fick and Mr. Marx,

17   and they would have to log things that they don't think are

18   relevant.  And then the privilege, if there is one, would be

19   preserved.  They could turn that over, and we could come back

20   through and we could ask the Court to look at something that

21   was not appropriate and not properly held back from us.

22        THE COURT:  That's fine with me.  Do you want to take

23   that on, Mr. Fick?

24        MR. FICK:  Yes, we'll make that inquiry.  And I think

25   since we are operating -- the sooner we can treat this the same

1    way we're treating the materials we did obtain and did produce,

2    we're fine.  I think we can -- you know, that step of logging,

3    now that the Court has made the waiver, the implied waiver

4    ruling, and we're handling this under this rubric, I think we

5    can establish whether there is anything else and produce it.

6            MR. BASIL:  Just for the record, the Court said I was

7    free to go ahead and ask Mr. Hinton for things.  Quite frankly,

8    I prefer not to be the one to ask him.  The Court has warned us

9    time and time again about taint.  The defense lawyers have also

10   warned against that issue.  If I ask him for something and he

11   gives me something, I don't want to have a self-inflicted wound

12   on that front.  So I think having him do this makes perfect

13   sense.

14           THE COURT:  That's fine.  Mr. Fick has agreed to do

15   it.  You should declare victory and put your shovel down.

16           MR. BASIL:  It's down, Your Honor.

17           THE COURT:  He's agreeable to do it that way.

18           MR. FICK:  I would hope there will be no controversy,

19   and of course we know who to call if there is.

20           THE COURT:  Who?

21           MR. FICK:  Well, we would file something, I guess,

22   rather than call.  It was a euphemism.

23           THE COURT:  I was hoping you would come up with

24   something other than call.

25           MR. FICK:  I think we could handle that in relatively

1    short order, and we're back here on the 5th.

2              THE COURT:  Mr. Dwyer, are you coming back?

3              MR. DWYER:  I think so, Your Honor.  I have one oral

4    motion, please, regarding Mr. Boncy's conditions of release.

5              THE COURT:  Yes.

6              MR. DWYER:  I spoke to the Government about it this

7    morning.  He is currently on bond living in Washington, D.C.,

8    but permitted to travel into the Eastern District of Virginia

9    where his brother lives.  He's sleeping at his cousin's, and I

10   would like to give him the opportunity to sleep at his

11   brother's as long as he gets approval from Probation, who is

12   supervising him, or Pretrial Release, who is supervising him in

13   D.C.

14             MR. BASIL:  No objection.

15             THE COURT:  That's fine.

16             MR. DWYER:  Thank you, Your Honor.

17             THE COURT:  Let someone in Probation know to make the

18   change.  Unless if you want to file something.

19             MR. DWYER:  I can file a proposed order.

20             THE COURT:  Just file it so it shows up on the record

21   in some way, shape, or form.

22             MR. DWYER:  Thank you, Your Honor.

23             THE COURT:  Anything else for today?

24             MR. BASIL:  Not from the Government, Your Honor.

25             MR. FICK:  No, Your Honor.

1          THE COURT:  All right.  See you in a few weeks.

2          (Adjourned, 3:07 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Linda Walsh, Registered Professional Reporter

4  and Certified Realtime Reporter, in and for the United States

5  District Court for the District of Massachusetts, do hereby

6  certify that the foregoing transcript is a true and correct

7  transcript of the stenographically reported proceedings held in

8  the above-entitled matter to the best of my skill and ability.

9             Dated this 18th day of January, 2020.

10

11

12            /s/ Linda Walsh_____

13            Linda Walsh, RPR, CRR

14            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25